**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DECEMBER 24, 2020

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 24, 2020

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| In the Matter of the Dependency of<br><br>A.L.K., L.R.C.K.-S., and D.B.C.K.-S.,<br><br>Minor children. | No. 98487-5<br><br>En Banc<br><br>Filed: December 24, 2020 |

WHITENER, J.—Under the federal Indian Child Welfare Act of 1978[1] (ICWA) and the Washington State Indian Child Welfare Act[2] (WICWA), the State must make "active efforts . . . to prevent the breakup of the Indian[3] family." 25 U.S.C. § 1912(d); *see also* RCW 13.38.130(1). Two of L.K.'s three children are Indian children for the purposes of ICWA and WICWA. L.K. claims that the Department of Children, Youth, and Families (Department) removed her children

---

[1] 25 U.S.C. §§ 1901-1963.
[2] Ch. 13.38 RCW.
[3] Consistent with our recent opinion in *In re Dependency of Z.J.G.*, 196 Wn.2d 152, 157 & n.3, 471 P.3d 853 (2020), we use the terms "Indian child" or "Indian family" when referring to statutory language. In other instances, we use the term "Native."

without making "active efforts" at keeping the family together as is required under ICWA and WICWA.

The Court of Appeals did not address this issue but, instead, sua sponte found that under the invited error doctrine, L.K. is precluded from raising this issue on appeal. It held that because L.K. repeatedly contended she did not need services, she cannot now claim on appeal that the Department did not provide her sufficient services under ICWA and WICWA. It did not reach the issue of whether the Department provided active efforts.

We reverse the Court of Appeals' holding that L.K. invited error that precluded appellate review of whether the Department made active efforts when she asserted at and before the dependency trial that she did not need services. Further, we address the issue of active efforts and hold that the Department did not engage in the statutorily required active efforts to prevent the breakup of an Indian family. Accordingly, we vacate the dispositional order continuing L.R.C.K.-S. and D.B.C.K.-S.'s foster care placement. We remand for immediate return of these two children to their mother, unless the court finds that returning the children puts the children in "substantial and immediate danger or threat of such danger." 25 U.S.C. § 1920; *see also* RCW 13.38.160. The finding of dependency is unaffected.

FACTS AND PROCEDURAL HISTORY

L.K. is the mother of seven-year-old A.L.K., four-year-old L.R.C.K.-S., and three-year-old D.B.C.K.-S. A.L.K. has a different father from her siblings. L.R.C.K.-S. and D.B.C.K.-S.'s father is a member of the Northern Arapaho Tribe (Tribe)[4] located on the Wind River Reservation. L.R.C.K.-S. and D.B.C.K.-S. are eligible for enrollment. The issues presented to this court affect only L.R.C.K.-S. and D.B.C.K.-S. as A.L.K. has not been found to be Native.

I.  History with the Department

L.K. has an extensive history with Child Protective Services (CPS) and the Department, having 19 prior allegations since 2013 and a prior dependency that was dismissed at fact-finding. In 2013, L.K. relapsed on methamphetamine while on probation, and the Department initiated a Family Voluntary Services (FVS) case. The Department offered her "project safe care parenting class, random UAs [urinalyses], mental health counseling, bus passes and . . . drug and alcohol evaluation." Transcript of Proceedings (sealed) at 252. While these cases usually last 90 days, the Department allowed L.K. to continue services for 7 months. L.K. did well for the first 4 months, but then her participation started to decline. The Department closed the case when L.K. declined services.

---

[4] The Tribe filed a notice to intervene as to L.R.C.K.-S. and D.B.C.K.-S. in November 2018. As an intervenor, the Tribe has filed a brief on the merits of the case in this court.

The Department initiated another FVS case in 2017 when it got a report that L.K. was in a detox unit while pregnant with D.B.C.K.-S. The Department set up a plan that included drug and alcohol treatment, evaluation, and UAs; childcare; housing; and in-home family preservation services. The in-home family services provider helped L.K. fill out applications, transported her to different housing, and got her into housing. However, L.K. chose to live in a motel instead of the housing provided for her. Nonetheless, the social worker who visited the motel said it was "clean" and there were no safety concerns. *Id*. at 271.

The Department also paid for childcare and provided childcare supplies, gas vouchers, and bus passes. This also included contacting the Tribe and letting the Tribe know the services that were being offered to the family. Although L.K. wanted the case to remain open so she had childcare, the case was closed after 90 days in March 2018 because the Department had offered all services and the only one L.K. was using was childcare.

II.   The Current Dependency Case

In August 2018, L.K.'s children were removed from her care for allegations of abandonment. A.L.K. was placed with her paternal grandmother, and L.R.C.K.-S. and D.B.C.K.-S. were placed in non-Native, licensed foster care as there was no relative placement available and no Native foster care placement. The Department also contacted the Tribe, who intervened in the case. The Department attempted to

4

find a relative or Native placement but could not by the time of the trial. The Department also set up visitation for L.K. with all the children together three times per week.

The Department repeatedly attempted to get L.K. to complete UAs and a hair follicle test, but she consistently refused. The court also ordered the tests, but she did not comply with the court order. When a social worker met with L.K. in September 2018, she offered assistance with housing and again asked for drug testing. The social worker testified that as to services, the Department recommended "a chemical dependency evaluation, random UAs, domestic violence perpetrator's assessment, safe and stable housing, parenting education, signed release of information, as well as psychological evaluation." *Id.* at 303-04. There is no indication that the social worker offered these services through referrals or helping with applications and setting up appointments. The social worker testified that L.K. stated she just wanted financial support and "on several occasions" said she was unwilling to engage in any services but visitation. *Id.* at 312.

At the dependency trial, L.K. testified that everything in the most recent CPS report was "a complete lie" and that she had no problem working with the Department, but she wanted a fair report. *Id.* at 20-21. She testified, "I need a lot of support for a lot of different things." *Id.* at 42. She also testified,

> I shouldn't—I shouldn't be here right now or I believe that the report says things that make people believe a certain way and it's completely—completely wrong. So, I'm—I have no problem working with the Department, but I want and I've asked to the Department to please tell the truth and it's not that difficult to say that I did not leave my kids and that I was there, but it's been difficult for the Department. So, I am not doing classes. I'm not doing any UAs. I'm not doing hair follicle. I'm strictly visiting my children and I am standing up for myself. I've gone through nineteen [CPS incidents]. . . . They've closed out and completed—completed me before and they are involved—they are—they are involved in our lives. . . . I've admitted, you know, my relapses and I've gotten help immediately for those and that's my belief and I just . . . I don't want to be lied about. I don't want to agree to anything that is not true and if it's written correctly or told correctly I don't think that there would be that big of an issue or concern like there is with how it's written right now, the report.

*Id.* at 48-49. She also repeatedly assured the court that she no longer had a drug problem.

The ICWA director for the Tribe filed a declaration as a qualified Indian expert indicating that continued custody by the parents would "result in serious emotional and physical damage" to the children. *See* Clerk's Papers (CP) (D.B.C.K.-S.) (sealed) at 153. She highlights that L.K. has attended visits but has not engaged in UAs, has not completed hair follicle testing, and does not have stable housing. She concludes that the Department has made "active efforts thus far to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and these efforts have proved unsuccessful." *Id.*

At the end of trial, the court found the children to be dependent and found that "active efforts were made to avoid removal, as set out in testimony and [d]eclaration of Qualified Indian Expert." CP (L.R.C.K.-S.) (sealed) at 183. L.K. did not challenge the active efforts by the Department at trial. The court also made a finding that continued custody by the mother "is likely to result in serious emotional or physical damage to the child." *Id*. at 180.

L.K. appealed, alleging that the Department did not make active efforts to prevent the breakup of an Indian family. The Court of Appeals declined to reach the issue and, instead, sua sponte, ruled that L.K. invited the error by stating she did not need services and thus was not entitled to review. L.K. appealed, and we granted review. 12 Wn. App. 2d 1074 (2020).

The King County Department of Public Defense, Seattle University Center for Indian Law & Policy, the University of Washington Children and Youth Advocacy Clinic and Parent Advocacy Project, Fred T. Korematsu Center for Law and Equality, Professor Matthew L.M. Fletcher, Northwest Justice Project, the ACLU of Washington, and Washington Defender Association have filed an amici brief in support of L.K.

ANALYSIS

I.      The Invited Error Doctrine

"Under the doctrine of invited error, a party may not materially contribute to an erroneous application of law at trial and then complain of it on appeal." *In re Det. of Rushton*, 190 Wn. App. 358, 372, 359 P.3d 935 (2015) (citing *In re Dependency of K.R.*, 128 Wn.2d 129, 147, 904 P.2d 1132 (1995)). To determine whether the doctrine applies, the court considers "whether the defendant affirmatively assented to the error, materially contributed to it, or benefited from it." *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 119, 340 P.3d 810 (2014) (plurality opinion); *see also In re Pers. Restraint of Thompson*, 141 Wn.2d 712, 724, 10 P.3d 380 (2000) (requiring knowing and voluntary action for invited error).

For example, in *State v. Henderson*, the defendant requested particular jury instructions, and the court gave them. 114 Wn.2d 867, 868-69, 792 P.2d 514, 515 (1990). On appeal, the defendant argued that the instructions were constitutionally infirm. *Id*. at 869. However, this court held that because the defendant was the one who proposed the instructions, he was precluded from appellate review under the doctrine of invited error. *Id*. at 871.

The interplay of dependency law and the invited error doctrine is found in *K.R.*, 128 Wn.2d 129. In that case, defense counsel moved for the admission of expert witness testimony on polygraphs without the required written stipulation,

8

and the motion was granted. *Id*. at 147. When it seemed the defense witness would not be able to testify, defense counsel moved to exclude the State's expert testimony for lack of the required stipulation. *Id*. The court denied the motion but allowed the defense expert to testify over the phone. *Id*. On appeal, the parents argued it was error to admit the expert polygraph evidence without the stipulation. *Id*. This court affirmed under the doctrine of invited error because defense counsel materially contributed to the error. *Id.*

The Court of Appeals held that L.K.'s position in the trial court that she did not need services and that the allegations against her were untrue precluded her from arguing on appeal that the Department did not engage in the statutorily required "active efforts" to provide her services (the specifics of which will be discussed in detail in the next section). All three parties disagree, as do we.

The Department contends that although there *could* be a case in which the invited error doctrine applies, the Department urges the court not to rely on it in this case. DCYF [Department] Suppl. Br. at 17. The Department rightly indicates that when the Department *does not* engage in active efforts, "a parent's reluctance to acknowledge parenting deficiencies should not block that person from raising that issue on appeal." *Id*. at 17-18.

The Tribe contends that the invited error doctrine is a doctrine, rarely used outside of criminal law in Washington, that has not been used against a parent in

an active efforts appeal. Suppl. Br. of Intervenor N. Arapaho Tribe at 6. The Tribe argues that L.K.'s refusing some services but taking advantage of others leads to a legitimate disagreement for the appellate court as to what services were necessary and whether the Department made active efforts to provide the services. *Id.* at 7. It does *not* mean L.K. is "setting up an error," and a refusal to engage in services does not relieve the Department of its statutory requirement to provide active efforts. *Id.*

L.K. contends that she did not "affirmatively contribute or consent to any error." Pet'r's Suppl. Br. at 19. She claims that she did not refuse all services or claim that no services would help her, and she emphasizes that she actively participated in visitation. *Id.* She argues that she did not invite error by failing to challenge the Department's active efforts at the dependency trial, and that she did not waive the right to active efforts by the Department when she denied needing services and declined drug testing. *Id.* at 20.We agree with the parties that the invited error doctrine does not apply in this case. The Court of Appeals improperly applied the doctrine, and we reverse as to this issue. L.K. did not assent to the alleged error, materially contribute to it, or benefit from it. To hold that a parent, who does not believe she needs services, loses the right to challenge the Department's failure to provide services as required by statute would be contrary to the goals of reunification and the very protections Native families receive under

ICWA and WICWA. Accordingly, the invited error doctrine does not apply to this case.

II.     ICWA and WICWA's "Active Efforts" Requirement

The Court of Appeals did not address whether the Department satisfied the "active efforts" requirement. We choose to address this important issue as this is a dependency case that is an expedited matter and the parties have fully briefed the issue.

Whether the Department has satisfied the "active efforts" requirement is a mixed question of law and fact. *In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 37, 456 P.3d 820 (2020) (citing *Bill S. v. State*, 436 P.3d 976, 981 (Alaska 2019)). "We review the underlying findings for substantial evidence, but review de novo whether those findings satisfy the requirements of ICWA." *Id.*

"ICWA and WICWA were enacted to remedy the historical and persistent state-sponsored destruction of Native families and communities." *In re Dependency of Z.J.G.*, 196 Wn.2d 152, 157, 471 P.3d 853 (2020). Both ICWA and WICWA require the Department engage in "active efforts . . . to prevent the breakup of the Indian family." This heightened standard differs from non-Native dependency cases. Under 25 U.S.C. § 1912(d),

> [a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the

11

> breakup of the Indian family and that these efforts have proved unsuccessful.

(Emphasis added.) RCW 13.38.130(1) is almost identical and inserts "involuntary" before "foster care placement" and "termination of parental rights."

ICWA does not define "active efforts," but 25 C.F.R. § 23.2 defines "active efforts" as

> affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case.

It then lists 11 examples of active efforts.

Under RCW 13.38.040(1)(a) "[a]ctive efforts" means "the department . . . shall make timely and diligent efforts to provide or procure such services, including engaging the parent . . . in reasonably available and culturally appropriate preventive, remedial, or rehabilitative services. This shall include those services offered by tribes and Indian organizations whenever possible." Further,

> In any dependency proceeding under chapter 13.34 RCW, in which the petitioner is seeking the continued out-of-home placement of an Indian child, the department or supervising agency must show to the court that it has actively worked with the parent . . . in accordance with existing court orders and the individual service plan to engage

them in remedial services and rehabilitative programs to prevent the breakup of the family beyond simply providing referrals to such services.

RCW 13.38.040(1)(a)(ii).

The Court of Appeals addressed the active efforts requirements in *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 439 P.3d 694 (2019). In that case, the father alleged that the Department did not make the required active efforts because he had received only one referral from the Department and it occurred 46 days after the dispositional order. *Id.* at 868. At a follow-up hearing, the father contended that he had made personal progress, but he could not complete all services because of the Department's failures. *Id.* at 869-70. The Court of Appeals held that the Department did not make active efforts because "several months had passed since the court ordered services, and the Department had not provided access to or referrals for the majority of the court-ordered services." *Id.* at 875. Further, one referral was too late for the father to complete the class, the Department knew of the father's housing issue but did not identify or assist with housing resources, and the Department had not contributed to any of the services the father identified himself. *Id.* Making no referrals and untimely referrals did not meet the active efforts requirement. *Id.*

Further, in *D.J.S.*, the Court of Appeals again found that the Department did not engage in active efforts. 12 Wn. App. 2d at 37. In that case, the Court of

Appeals relied on Alaska precedent as Alaska "leads the nation in interpreting ICWA." *Id.* at 27. The court adopted rules from *Bob S. v. State* in which the Alaska Supreme Court opined,

> When determining whether [the Office of Children's Services] made active but unsuccessful efforts, courts may look to "the [S]tate's involvement in its entirety" and may consider "a parent's demonstrated lack of willingness to participate in treatment." "Our concern is not with whether the State's efforts were ideal, but whether they crossed the threshold between passive and active efforts."

400 P.3d 99, 107 (Alaska 2017) (second alteration in original) (footnotes omitted) (citing case).

Relying on these rules, and other out-of-state precedent, the Court of Appeals lays out that the active efforts requirement requires *more* than just creating a case plan and handing out referrals. The Department must *affirmatively* assist the parent, and "when a parent fails to engage satisfactorily with a caseworker, the caseworker *still must try to engage the parent*." *D.J.S.*, 12 Wn. App. 2d at 33 (emphasis added) (citing *In re Matter of K.L.*, 2019 MT 256, ¶ 37, 397 Mont. 446, 451 P.3d 518).

In finding that the Department did not engage in active efforts, the Court of Appeals examined the father's claims that the Department did not assign culturally competent help, did not provide a Native counselor, and did not actively seek housing for the father, among other failings. *D.J.S.*, 12 Wn. App. 2d at 35-37. The court then details how the Department failed to affirmatively engage in services.

*Id*. at 36-37. For example, instead of having the father learn how to gain housing himself, the court opined that the Department should have taken him to the resource and helped him fill out applications. *Id*.

In *In re Dependency of A.M.*, 106 Wn. App. 123, 136-37, 22 P.3d 828 (2001), the Court of Appeals held that the superior court could look to a parent's unwillingness to participate in services when determining if the Department had provided "active efforts" in a termination trial. In that case the Department provided the mother with services until she left drug treatment and subsequently cut off all communication with her child, her tribe, and her social worker for two years. *Id*. at 136. The court relied on the provision of initial services to show that the Department had made active efforts and relied on the mother's decision to cease all communication for years as evidence to show that she *made it impossible* for the Department to provide further services. *Id*. at 136-37.

It is important to note that both *A.M.* and *D.J.S.* concern termination trials where services were court ordered. In the present case, prior to the dependency trial the court had conducted only shelter care hearings. However, "[t]he court may not order a parent to undergo examinations, evaluation, or services at the shelter care hearing *unless* the parent *agrees* to the examination, evaluation, or service." RCW 13.34.065(4)(j) (emphasis added); *see also* CP (L.R.C.K.-S) (sealed) at 18 (ordering UAs and hair follicle tests at shelter care hearing), 21 (L.K. did not sign

15

the shelter care order). Where the parents in *A.M.* and *D.J.S.* were required to engage in services, L.K. was not. There is a material difference between parents refusing to engage in court-ordered services and the present case, where L.K. refused to engage in a *voluntary* service. A parent's declination to engage in voluntary services prior to a finding of dependency cannot be used as evidence that the Department has engaged in active efforts for the purposes of removing children from their parent's care.

We hold that the Department in the present case did not engage in active efforts as is required under ICWA and WICWA. Here, the social worker testified as to a case plan and assistance with housing and chemical dependency. But, similar to *D.J.S.*, there is no indication in the record that the social worker actively made attempts to help L.K. access any services other than helping with one phone call and a case plan. She did not drive L.K. to services or assist her with filling out forms or applications. As L.K. observes in her supplemental briefing, "The social worker appears to have inferred Ms. L.K. would refuse parenting and counseling services and no testimony establishes if or when those [services] were offered." Pet'r's Suppl. Br. at 13. The record establishes that L.K. did not want all of the services the Department offered, but not that the Department made attempts to engage in active efforts to ensure she received services, even if they were unwanted. Further, the present case is distinguishable from *A.M.* Here, L.K. has not

ceased all communication and disappeared for years. Quite the opposite. She is attending her visitation and asking for services she wants, while rejecting a service she does not want and cannot be ordered to do at this time.

The Department contends that because it made active efforts in the prior FVS cases and, then, in the current case L.K. rejected services, this court should find active efforts overall. The flaw in this argument is that the Department admits that it knows how to engage in active efforts because it did so in the FVS cases. Nonetheless, the Tribe agrees with the Department, adding that the Department did engage in active efforts to involve the Tribe in the proceedings. However, the tribal representative does not indicate what active efforts the Department made. In her declaration the tribal representative does not indicate that she had any conversations with L.K. but, instead, simply relied on conversations with the social worker and a review of the case file, which shows that only referrals were made. Further, the tribal representative seems to have applied an incorrect standard as she indicates that "parents have not completed recommendations even though numerous referrals and attempts have been made" when the Department must do *more* than make referrals. CP (D.B.C.K.-S.) (sealed) at 154. Although *D.J.S.* holds it would be appropriate to look at the entirety of the Department's interactions with a parent, this does not relieve the Department from its obligation to provide *timely*

active efforts in the *current* case. Having provided active efforts in the past is not sufficient to show timeliness in the present case.

The contrast between the FVS cases and the present dependency case highlights the Department's failure to provide L.K. with active efforts in the present case because, unlike the FVS cases, in the context of this dependency it does not appear the Department has done much more than create a service plan and provide a housing referral. As the Court of Appeals has held multiple times, this is *not* sufficient to show active efforts. In the FVS cases the Department provided counseling, in-home preservation services, day care, and obtained housing for L.K. Ultimately the court did not find the children dependent at a subsequent fact-finding, so one can infer that the FVS case services did prevent the breakup of the family at that time.

Accordingly, we hold that the Department did not engage in active efforts to prevent the breakup of L.K's family prior to removing her Native children.

III. The Remedy

Under 25 U.S.C. § 1920,

> [w]here any petitioner in an Indian child custody proceeding before a State court has improperly removed the child from custody of the parent or Indian custodian or has improperly retained custody after a visit or other temporary relinquishment of custody, the court shall decline jurisdiction over such petition and shall forthwith return the child to his parent or Indian custodian *unless returning the child to his parent or custodian would subject the child to a substantial and immediate danger or threat of such danger*.

(Emphasis added.) RCW 13.38.160 is almost identical and contains effectively the same emphasized language. Consistent with these statutes, the Department argues that the remedy when the Department improperly removes the children without providing active efforts is to affirm the dependency order, but to vacate the dispositional order's out-of-home placement and to remand for a determination of whether returning the children would subject the children to substantial and immediate danger or threat of danger. We agree.

In *A.L.C.*, the father agreed to an order of dependency and to out-of-home placement until he could find housing. 8 Wn. App. 2d at 867. In response to the Department's report for a dependency review hearing, the father argued that the Department had not made active efforts to reunify the family as was required under ICWA and WICWA. *Id*. at 868. The trial court held that the Department had made active efforts, but the Court of Appeals reversed. *Id*. at 870. As to the remedy, the Court of Appeals opined,

> Here, the Department has improperly maintained A.L.C.'s placement in out-of-home care because the Department has failed to provide active efforts to prevent the breakup of the Indian family. The appropriate remedy is the remedy prescribed by statute. Thus, we remand to the juvenile court to either immediately return A.L.C. or make the statutorily required finding that returning A.L.C. will subject her to substantial and immediate danger or threat of such danger.

*Id*. at 877.

Similarly, in the present case, the Department has improperly maintained the out-of-home placement as it did not provide active efforts to prevent the breakup of this family in the present case. Under the statute, the remedy is to remand to the trial court to immediately return L.R.C.K.-S. and D.B.C.K.-S. to their mother if it cannot make the statutorily required finding that returning them would subject them to "a substantial and immediate danger or threat of such danger." Accordingly, we reverse the dispositional order's foster care placement and remand for further proceedings consistent with this opinion.

CONCLUSION

We reverse the Court of Appeals and hold that L.K. did not "invite error" when she asserted she did not need services. Further, we vacate the dispositional order and the trial court's ruling that the Department engaged in "active efforts" as required by ICWA and WICWA. Accordingly, we remand to the trial court to resolve the issue of the foster care placement, after consideration of whether returning the children to their mother would cause a substantial risk of harm, and for further proceedings consistent with this opinion. The finding of dependency is unaffected.

Whitener, J.

_____

WE CONCUR:

Stephens, C.J.

González, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

_____

No. 98487-5

MONTOYA-LEWIS, J. (concurring)—As the majority states, the State is

required to engage in "active efforts" throughout a dependency involving the

Indian Child Welfare Act (ICWA) and the Washington Indian Child Welfare Act

(WICWA).  25 U.S.C. § 1912(d); RCW 13.38.130(1).  As discussed extensively in

*In re Dependency of Z.J.G.*, the ICWA and WICWA statutes exist to prevent the

breakup of the Indian family and to ensure the continued existence of tribes, tribal

communities, and tribal families.  196 Wn.2d 152, 471 P.3d 853 (2020).  The

definition of "active efforts" is perhaps the *most* discussed area of ICWA by social

workers, lawyers, and judicial officers when considering how to practically apply

ICWA to specific familial situations.  It is, however, perhaps the *least* discussed

area in the state and federal case law.

This, therefore, leads to enormous confusion in the field. Social workers and

their departments attempting to comply with active efforts often have guidance that

means they must do *more* than they would in a case that requires reasonable

1

efforts, but not how much more or in what ways.[1]  Similarly, lawyers struggle with

how to prove that a social worker took "active efforts," and judicial officers also

lack the kind of guidance that can be useful in specific cases.

25 C.F.R. § 23.2 defines "active efforts," as the majority describes.  There

are several aspects of this definition that can be used in this case to more

concretely illustrate what active efforts means in the field of ICWA. For one thing,

the definition makes clear that social workers must work proactively,

collaboratively, and culturally appropriately.  25 C.F.R. § 23.2 explains:

> Active efforts are to be tailored to the facts and circumstances of the
> case and may include, for example:
> . . . .
> (2) Identifying appropriate services *and helping the parents to
> overcome barriers, including actively assisting the parents in
> obtaining such services*;
> . . . .
> (8) Identifying community resources including housing,
> financial, transportation, mental health, substance abuse, and peer
> support services *and actively assisting the Indian child's parents or,
> when appropriate, the child's family, in utilizing and accessing those
> resources*.

---

[1] The use of "active efforts" versus "reasonable efforts" has been called the "gold standard" of social work in dependencies. NAT'L INDIAN CHILD WELFARE ASS'N, SETTING THE RECORD STRAIGHT: THE INDIAN CHILD WELFARE ACT FACT SHEET (2015), https://www.nicwa.org/wp-content/uploads/2017/04/Setting-the-Record-Straight-ICWA-Fact-Sheet.pdf [https://perma.cc/UB55-PKSM].  While all families and children deserve the active efforts of the governmental departments that work with them, both budgetary and personnel issues so far prevent this.

(Emphasis added.) In the dependency petition in this case, the Department of

Children, Youth, and Families (Department) cited L.K.'s housing instability as a

reason it recommended out-of-home placement. But there is no evidence that the

Department did any more than refer her to a few shelters. There is no evidence that

the Department identified appropriate services that would enable L.K. to secure

stable housing, recognized barriers that would prevent her from doing so,[2] or

"actively assist[ed]" her in accessing or utilizing resources relating to housing. *Id.*

Instead of making "affirmative, active, thorough, and timely efforts intended

primarily to maintain or reunite the Indian child[ren] with [their] family," *id.*, the

Department merely referred L.K. to temporary housing after it determined that

housing instability was a reason to remove the children from her care. Given that

RCW 13.34.020 states that "[t]he right of a child to basic nurturing includes the

right to a safe, stable, and permanent home *and* a speedy resolution of any

proceeding under this chapter," it appears that the legislature intended that the

Department actively engage in assisting a family in finding safe and stable housing

to preserve the family unit, regardless of whether the family is an Indian family.

---

[2] *See* SUZANNE SKINNER, SEATTLE UNIV. SCH. OF LAW HOMELESS RIGHTS ADVOCACY PROJECT, SHUT OUT: HOW BARRIERS OFTEN PREVENT MEANINGFUL ACCESS TO EMERGENCY SHELTER 11-33 (Sara K. Rankin ed., 2016), https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1004&context=hrap [https://perma.cc/98LP-NHKP] (discussing numerous barriers to accessing homeless shelters, including insufficient beds, unsanitary and unsafe conditions, and a shortage of shelters for families).

(Emphasis added.) The requirements of ICWA and WICWA, however, make it crystal clear that it is the Department's responsibility to do more than refer someone to temporary housing when it decides that instability in housing is a reason to break up the Indian family.

Prior cases have held that simply providing lists of referrals to a parent in an ICWA proceeding does not meet the active efforts standard. *See In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 33, 456 P.3d 820 (2020) ("'Active efforts' require more than a referral to a service." (citing *In re Beers*, 325 Mich. App. 653, 680, 926 N.W.2d 832 (2018))).[3] In this case, the Department testified that it repeatedly attempted to get L.K. to complete urinalyses (UAs), but she refused, even after a court order that she do so. A careful reading of 25 C.F.R. § 23.2 shows that the burden of active efforts lies with the Department to engage the parent in developing a case plan that the parent understands and can "access[] or develop[] the resources necessary to satisfy the case plan." Department social workers should expect resistance from parents, but particularly from parents of Native children, given the horrific and long-term attempts to destabilize the Indian

---

[3] *See also In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 874, 439 P.3d 694 (2019) (Department failed to make active efforts when a dispositional order required the parent to engage in several assessments but, several months later, the Department "had done little more than" provide a referral for one of the assessments); *State ex rel. Children, Youth & Families Dep't v. Yodell B.*, 2016-NMCA-029, ¶ 26, 367 P.3d 881 (2015) (Department failed to make active efforts when it "pointed Father in the direction of service providers, but did little else to assist Father in implementing the treatment plan").

family. *See, e.g.*, *Z.J.G.*, 196 Wn.2d at 165. In addition to that resistance—which I note is obvious in L.K.'s testimony that the Department was repeatedly lying about her to the court—the vast majority of Native parents are offered services that have little to no connection to "the prevailing social and cultural conditions and way of life of the Indian child's Tribe." 25 C.F.R. § 23.2.

Moreover, requiring a parent to participate in assessments is not equivalent to making active efforts to assist the parent in accessing services or developing the resources necessary to keep the family together. *Id.* As the majority describes on page 5, in 2018 the Department offered L.K. assistance with housing and requested drug testing. The majority lists the services the Department requested as "'a chemical dependency evaluation, random UAs, domestic violence perpetrator's assessment, safe and stable housing, parenting education, signed release of information, as well as psychological evaluation.'" Majority at 5 (quoting Transcript of Proceedings (sealed) at 303-04). These "*services*" are more accurately described as *requirements*. The Department sought L.K.'s participation in determinations as to her drug and alcohol usage, her involvement in domestic violence, and her ability to parent and to complete parenting education classes, as well as her completion of a full psychological evaluation. Many of these requirements mirror the requirements of hundreds of dependencies across courthouses in this state.

I recognize that at an early stage of a dependency, knowing what "appropriate services" might be takes time. But it is incorrect to describe requirements parents must engage in in order to *avoid dependency* as services. Services are intended to resolve the issues that gave rise to the dependency. Evaluations, visitation observations, and other requirements are not equivalent to services to remedy the parental deficiencies identified by the evaluations. Rather, they are assessments of the parent to determine whether a family should remain intact. Those of us who have worked in the dependency arena understand (or should understand) that the standard evaluations like the ones ordered in this case require the parent to undergo personal and invasive testing and observation. While that may be unavoidable in order to determine services necessary to either keep a family intact or reunify a family, I would argue that calling those intensive observations *services* to the parent is disingenuous, at best.

As discussed by the majority, L.K. herself is not Native, though two of the children involved in this dependency are. This makes this case an ICWA case, and the active efforts required apply to everyone in this case, including the non-Native mother. It may seem a remarkable statement to argue that L.K. should be given services that take into account the tribal needs of the Indian family given that she is non-Native. But the law here is clear:

> To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of *the **Indian child's** Tribe and should be conducted in partnership with the Indian child and the Indian child's parents . . . and Tribe.*

25 C.F.R. § 23.2 (emphasis added). The Code of Federal Regulations makes clear that the focus in providing active efforts is on the maintenance of the Indian family. When a non-Native parent is involved, she is nevertheless part of an Indian family, and she is also entitled to active efforts, which is more than providing a referral and giving her a series of requirements to complete.

Thus, active efforts involve the identification of the issues necessary to remedy the parental deficiencies and maintain the Indian family, and it requires that the Department be engaged, "*with* the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe." *Id.* (emphasis added). There is little evidence in this record that any of the requirements demanded of L.K. involved any of these individuals or organizations. (And, as the majority states, none of the evaluations and other demands made of L.K. actually were required because these are voluntary services at this stage of the case and her refusal to participate does not violate a court order. RCW 13.34.065(4)(j); majority at 15-16.) Further, L.K. asked for services she believed could avoid the breakup of the family, and no such services were provided. When a struggling parent can identify the help they need and the Department does not engage in an active effort

7

to assist in providing it, it is impossible to see how 25 C.F.R. § 23.2 can be

satisfied.

The requirements made of L.K. were numerous, invasive, and complex. It is

clear from the record that L.K. did not want to comply, except to participate in

visitation and to receive financial support. She disputed the contents of the

Department's report and the social worker's testimony at her dependency trial,

though she acknowledged a history of drug use, addiction, and relapses. The

qualified Indian expert at the trial agreed that the Department had made active

efforts and that those efforts "have proved unsuccessful." Clerk's Papers

(D.B.C.K.-S.) (sealed) at 154.

I agree that the "invited error" doctrine does not and should not apply to this

case. I would go beyond the majority's holding, however, and conclude that the

resistance a parent may show to the numerous requirements and demands the

Department makes of parents at these early stages of dependencies should never be

found to be "invited error." Even for parents who have been through prior

dependency cases, as L.K. had, parents at this stage of dependency proceedings are

most often confused, overwhelmed, and expected to follow a schedule of

appointments the most capable of us would find difficult.

I note one further issue that did not get raised during the case. 25 C.F.R.

23.2 requires states (as do ICWA and WICWA) to exhaust every effort to identify

placements in accordance with placement requirements laid out in ICWA. The majority states, the "The Department attempted to find a relative or Native placement but could not by the time of the trial." Majority at 4-5. The record is silent as to the efforts the Department undertook to keep these children together with their older sibling or with a relative or Native placement. 25 C.F.R. 23.2 again requires the Department to engage in active efforts to keep children together by identifying extended family because it is "consistent with the need to ensure the health, safety, and welfare of the child." Although this issue is not raised in this case, I have rarely seen all such efforts exhausted and find the separation of these children from each other a further tragedy in this case and a *continuation*, not a remedy, to the state-sponsored breakup of the Indian family. This issue, like many others involving ICWA and WICWA, is a crisis that is causing trauma now to families and tribes, and it should be treated as such.

Montoya-Lewis, J.