IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 39095-1-III |
| | ) | |
| J.R.[†] | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — The mother of 7-year-old J.R., a child who is eligible or potentially eligible for membership in the Cherokee Tribe, appeals an order of dependency finding J.R. dependent under RCW 13.34.030(6)(c). The mother's single assignment of error is to the trial court's conclusion that the Department of Children, Youth and Families (the Department) met its burden to prove it had engaged in "active efforts" to prevent J.R.'s out-of-home placement, as required by the Indian Child Welfare Act of 1978[1] (ICWA) and the Washington State Indian Child Welfare Act[2] (WICWA).

The Department concedes that substantial evidence does not support the trial court's findings and conclusion. We agree, reverse the disposition order, and remand with directions to immediately return J.R. to a parent's care unless the court finds that

---

[†] To protect the privacy interests of the minor child, we use her initials. Gen. Orders of Division III, *In re Changes to Case Title* (Wash. Ct. App. Sept. 1, 2018), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp& ordnumber=2018_001&div=III.

[1] 25 U.S.C. §§ 1901-1963.

[2] Ch. 13.38 RCW.

doing so would subject her to a substantial and immediate danger or threat of such danger.

## FACTS AND PROCEDURAL BACKGROUND

On January 25, 2022, Child Protective Services (CPS) received an intake from law enforcement that they found J.R. living with her grandmother in a van without heat and with minimal food. J.R. was taken to Sacred Heart Hospital for medical clearance before being taken to Vanessa Behan Crisis Nursery.

Elizabeth Nielsen, a CPS investigator, was assigned to the intake the next day. She spoke to J.R.'s mother, who told Ms. Nielsen she had been with J.R. on the morning of the day J.R. was found in the van, and had left J.R. in the care of a friend while attending a doctor's appointment. The mother said her friend allowed the grandmother to take J.R., not knowing the grandmother was not allowed to watch or take J.R. Ms. Nielsen was told by others, including J.R., that she had been staying with her grandmother for at least a week, but the mother's friend supported the mother's version of events.

On January 27, 2022, Ms. Nielsen petitioned to have the court find J.R. dependent and enter a disposition order. In addressing whether reasonable efforts had been made to prevent or eliminate the need for removing J.R. from her home, the dependency petition acknowledged that services had not been offered prior to removal, attributing this to "[t]he emergent nature of the case." Clerk's Papers (CP) at 4.

Ms. Nielsen spoke with the individual whom the mother says and the Department believes is J.R.'s father. He is not identified by J.R.'s birth certificate and the record on appeal does not indicate that paternity has been established. He told Ms. Nielsen he had not been involved much in J.R.'s life.

Ms. Nielsen had become aware that a number of prior CPS intakes reported substance abuse by the mother, but they had been screened out without founded findings. According to Ms. Nielsen, the alleged father affirmed that the mother had "been known to have some drug abuse issues." Rep. of Proc. (RP) at 20. On the basis of concerns about the mother's possible drug use, J.R. was ordered placed with her alleged father as a suitable "other placement" at that time. CP at 43.

On February 3, 2022, it was determined that based on the alleged father's report of Native American ancestry there was reason to know J.R. is an Indian child.

A contested shelter care hearing as to the mother was held on February 4, 2022. It was determined that J.R. had no parent, guardian, or legal custodian to provide for her supervision and care. The alleged father was identified as the "suitable other" with whom J.R. would remain placed. CP at 69. The shelter care order identified the services that were offered and agreed to by the mother as random UAs[3], an evidence-based parenting program, and gas vouchers.

---

[3] Urinalysis.

Shortly thereafter, the Department learned that a UA provided by the alleged father on January 31, 2022, had tested positive for methamphetamine and amphetamine. It moved for a change of placement. In a declaration filed in support of the changed placement, Ms. Nielsen explained that concerns about ongoing substance use by the mother remained. The mother had "no showed" for UA testing on January 27 and 28, 2022. During the shelter care hearing on February 4, which was held at 11 a.m., the mother reportedly said she would be going to complete a UA once the hearing was over, but she inexplicably appeared at the testing facility at 5:53 p.m., which was too late. She had previously been told she should try to arrive before 5:30 p.m. and clients were not accepted for testing after 5:45 p.m.

On February 11, 2022, the trial court heard the motion for changed placement. The alleged father admitted that he had lied to the CPS investigator about his last drug use, concerned that J.R. would not be placed with him. J.R. was ordered placed with the Department in a licensed foster placement. She was later removed from foster care after she was observed to have unexplained bruising.

*Appointment of a social worker and efforts at remedial services and rehabilitative programs*

Zadia Short, the first social worker assigned to the mother's and father's dependency cases, was not assigned until February 22, 2022, almost a month after J.R. was removed from the mother's care. It was not until over four months later, on July 8,

4

that the mother's contested dependency and disposition hearing was held.[4]  Testimony at

the July 8 hearing revealed that the mother's communication with Ms. Short and

participation in services had been poor and that the Department's own efforts had been

less than "active."

*February and March*

A week after J.R. was removed from her mother's care, the mother was evicted

and became homeless.  The Department did not help her locate housing; Ms. Short

testified, "We don't typically help our clients with housing."  RP at 102.

Ms. Short was responsible for arranging visitation for the mother after the shelter

care hearing.  She acknowledged that the mother missed many visits.  She testified that as

of the hearing, she had made eight referrals for visitation services "due to the lack of [the

mother's], like, engagement, I guess poor attendance."  RP at 89-90.  According to notes

to which Ms. Short referred during the hearing, the mother had been scheduled for three

visits in February and missed two.

In mid-March 2022, the Department moved the court to place J.R. in relative care

with a maternal aunt who lives in Puyallup.  The parents agreed, despite the impact it

would have on visitation.  They reportedly understood and agreed that they would have

visitation once a week.  The placement was approved by the court, which ordered that the

---

[4] The father had stipulated to an order of dependency and order of disposition in mid-April.

parents would have one weekend visit per week at the maternal aunt's home, lasting up to three hours, and that the Department would provide gas vouchers and hotel accommodations for the parents for one night. The court also ordered two supervised phone/Zoom visits with J.R. during the week for up to 2 hours each.

*April, May, June and early July*

Ms. Short testified that from April through May, the mother attended 12 visits with J.R. and missed 7.

On her own, the mother obtained a chemical assessment from Pioneer Services and a referral to engage in long-term, inpatient substance use treatment at Isabella House beginning on May 11. She explained at trial that "[m]ultiple people" told her that qualifying for the inpatient program at Isabella House was "a really good program to get your kids back." RP at 42-43. Sharon Jackson, a substance abuse disorder professional and counselor with Isabella House, testified at the hearing that Isabella House offers 3.3 level treatment—long-term in-patient care at which a parent can be accompanied by and continue to parent a child—which is what Pioneer had recommended for the mother.

According to Ms. Jackson, the mother admitted during her intake to methamphetamine use. At the fact-finding hearing, however, the mother denied any current drug use. She said she "[didn't] believe" she had told personnel at Pioneer that she was using illegal drugs; she claimed she "told them of [her] history in the past" in order to obtain a referral to Isabella House. RP at 43.

6

Ms. Jackson testified that the mother was discharged from Isabella House within two days, on May 13. She was discharged for failing to comply with the dosage requirements of her prescriptions. According to Ms. Jackson, while the mother had been given a special dispensation to use prescribed benzodiazepines from which she was allegedly tapering off,[5] she was discharged after she self-administered more than the permitted dosage. The mother blamed her discharge from Isabella House on a misunderstanding about her medication plan.

No other efforts were made to engage the mother with treatment.

A referral of the mother to an evidence-based parenting program was not made until sometime in May. As of the July fact-finding hearing she had not yet started the program, but she had been contacted by a provider. Asked why it had taken that long to make the referral, Ms. Short testified that the mother "was pretty slow to engage," and "hard to connect with." RP at 105-06.

A problem with the mother's visitation in Puyallup arose after the first couple of visits, when the mother's aunt, who had agreed to supervise, changed her mind and agreed to supervise only one more visit. In June, according to Ms. Short, the mother had only one in-person visit with J.R. From May to June, she had 15 scheduled Zoom visits, but only made 2 of them and missed 12.

---

[5] Benzodiazepines were generally not permitted at all at Isabella House.

The Department made visit referrals to agencies in the Puyallup area. One agency picked up the referral but dropped it after being unable to contact the mother. At the time of the July 8 hearing, Ms. Short testified that a second agency had picked up the referral and she believed arrangements were being made for the mother to do an intake for the service.

The mother admitted she had missed visitation with J.R., but testified that her understanding of the reason visitation had been cancelled was because J.R. was saying she did not want to visit. She testified that at the recent shared planning meeting, it was agreed that doing or not doing the visits should not be J.R.'s choice.

Between Ms. Short's assignment to the dependency cases in February and the contested hearing in July, Ms. Short testified there had been one shared planning meeting or permanency planning meeting. Ms. Short admitted that in this mother's case, it would be most helpful for her to have such a meeting once a month.

Despite repeatedly attributing the mother's lack of engagement and progress to the mother's periodically being without a phone, Ms. Short acknowledged that she had never offered to provide the mother with a phone, explaining that "[s]he appeared to be able to connect with me with different phone numbers. It somehow seemed that she was able to get a phone." RP at 108. Ms. Short admitted that communication would have been more consistent if the Department had been able to provide the mother with a working phone with available minutes.

Ms. Short testified that the mother had no-showed for almost all of her UAs. She testified the Department received test results for only a couple of UAs from the mother: one, that tested negative, and another for which they received conflicting test results. The conflicting results both tested positive for a benzodiazepine, but one result indicated that it was a medication prescribed for the mother and the other indicated that it was an unprescribed medication. Ms. Short could not explain the discrepancy. RP at 111. The mother admitted learning from her lawyer on the day of the fact-finding hearing that she had missed UAs by failing to call in daily, but claimed she was sometimes unable to call.

To assist with transportation, Ms. Short testified that she offered the mother gas vouchers monthly but was aware that many of the vouchers went unused because the mother never picked them up. The mother testified she had been provided with only four $50 gas vouchers over the five-plus months of the dependency, not because she failed to pick them up, but because "I've asked Dottie multiple times and she—didn't respond. I kind of gave up on it." RP at 52. The mother also testified that gas vouchers were no longer doing her much good, explaining, "[I] don't have a vehicle right now." RP at 70.

Ms. Short said she had been unaware that the mother's car was not in working order until the most recent review hearing. She acknowledged that she had not attempted to help the mother with transportation to make visits thereafter, but "we can once she gets a visit confirmed." RP at 109.

9

In closing argument at the fact-finding hearing, the Department's lawyer asserted the Department had "done its best to try to engage [the mother] in services," but these efforts were impeded by the mother's communication barriers and distrust of the Department. RP at 124-25. The mother responded that the Department failed to make efforts to overcome these barriers and did not meet its burden under ICWA and WICWA to provide active efforts.

In orally ruling at the end of the hearing, the commissioner stated that the mother faced many challenges with housing, transportation, and communication over the course of the dependency but, on the issue of active efforts, stated, "I do find that there's been active efforts—by the department in trying to make referrals. Could there be more efforts? Yes. Could there be more efforts from [the mother]? Yes." RP at 144. In its written order, the court found:

> 8.      The Department has made active efforts in this case regarding referrals, but there could be more effort. The child was placed with a maternal aunt at the parents' request on the west side of the state on 1/25/22. The mother was evicted about a week after the dependency petition was filed and has had difficulty communicating because of issues with her phone and her car. There are several barriers and challenges present for the mother regarding communication, stable housing, and transportation.

CP at 169. The court went on to check the boxes on the form disposition order that active efforts had been made by providing "specific services . . . outlined in the Dependency Petition and subsequent documents" that it "incorporated by reference." CP at 170.

The court concluded J.R. was dependent under RCW 13.34.030(6)(c) and the requirements of ICWA and WICWA were met. The court ordered J.R. to remain placed with her aunt under Department supervision. The mother appeals.

ANALYSIS

The mother's single assignment of error is to the trial court's conclusion that the Department proved it had engaged in active efforts to prevent out-of-home placement of J.R., as required by ICWA and WICWA.

ICWA was enacted by Congress "in response to a lengthy and concerted effort by tribal leaders who sought to end the wholesale removal of Indian children from their families by state and private agencies." *In re Dependency of Z.J.G.*, 196 Wn.2d 152, 164, 471 P.3d 853 (2020). ICWA aims to protect the sovereignty and future prosperity of tribes by setting minimum federal standards for the removal of Indian children from their families. *Id.* at 182-83; 25 U.S.C. §§ 1901, 1902. Among them is a requirement that a party seeking an involuntary foster care placement of an Indian child satisfy the court that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); RCW 13.38.130(1).

WICWA was enacted in 2011. LAWS OF 2011, ch. 309, §§ 1-20. Like other state statutes paralleling ICWA, it can serve to clarify ICWA or add protections, and was meant to strengthen Washington's enforcement of the fundamental protections that

11

ICWA guarantees to an Indian child, their parents, and their tribes. *Z.J.G.*, 196 Wn.2d at 171.

Whether the Department has satisfied the "active efforts" requirement presents a mixed question of law and fact. *In re Dependency of G.J.A.*, 197 Wn.2d 868, 887, 489 P.3d 631 (2021) (internal quotation marks omitted). The trial court's factual findings are reviewed for substantial evidence. Washington courts have held that the standard of proof required to demonstrate active efforts is clear, cogent, and convincing evidence. *In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 28, 456 P.3d 820 (2020), *abrogated on other grounds by G.J.A.*, 197 Wn.2d 868; *In re Dependency of A.M.*, 106 Wn. App. 123, 134-35, 22 P.3d 828 (2001). The legal question of whether the Department made active efforts compliant with ICWA and WICWA is reviewed de novo. *G.J.A.*, 197 Wn.2d at 887.

ICWA does not define "active efforts," but federal regulations implementing the law instruct that "active efforts" must be "affirmative, active, thorough, and timely." 25 C.F.R. § 23.2. Where an agency like the Department is involved in the child-custody proceeding, "active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." *Id.* Active efforts "are to be tailored to the facts and circumstances of the case." *Id.*

12

The Department "cannot simply provide a referral and leave the parent to engage with providers and complete services on their own." *G.J.A.*, 197 Wn.2d at 891-92 (citing RCW 13.38.040(1)(a) (requiring the Department to prove that it has "actively worked with the parent . . . to engage them in remedial services and rehabilitative programs . . . beyond simply providing referrals to such services") (first alteration in original) (quoting *G.J.A.*, 197 Wn.2d at 894)). The Department does not engage in active efforts by simply meeting with a parent, reviewing services, and providing instructions on how to obtain a phone, housing, and counseling. *Id.* at 892 (citing *D.J.S.*, 12 Wn. App. 2d at 36-37). Examples of active efforts include, but are not limited to identifying appropriate services and helping parents to overcome barriers, supporting regular visits, identifying community resources and actively assisting the parents to utilize those resources. *Id.*

In *In re of Dependency of A.L.K.*, 196 Wn.2d 686, 696-97, 478 P.3d 63 (2020), our Supreme Court held that a parent who denies needing services and declines drug testing does not lose the right to challenge the Department's failure to provide services by inviting error; the invited error doctrine does not apply, because it would be contrary to the goal of reunification. In *G.J.A.*, the court held that the futility doctrine likewise does not apply, since ICWA and WICWA require the Department to prove that it made sufficient efforts and its efforts "'have proved unsuccessful.'" 197 Wn.2d at 875 (quoting 25 U.S.C. § 1912(d) and RCW 13.38.130(1)).

The Department must document its provision of active efforts in the record, including by retaining information on "[d]ates, persons contacted, and other details evidencing how [it] provided active efforts," and "[r]esults of the active efforts provided and, where the results were less than satisfactory, whether [it] adjusted the active efforts to better address the issues." *G.J.A.*, 197 Wn.2d at 893 (citing BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT[6] 43, 44 (2016); 25 C.F.R. § 23.120(b)).

In the factual and procedural background, we summarized the Department's evidence of its actions during the more than five months before the fact-finding hearing. Given the legal standards and burden of proof that apply, little need be said to explain why the Department concedes, and we concur, that it failed to demonstrate active efforts at the fact-finding hearing. The only active effort found by the court was providing referrals, which is insufficient as a matter of law. There was no showing that the Department was heeding the mother's failures to engage and responding with thoughtful adjustments to its efforts.

The remedy, where an Indian child has been improperly removed from the custody of a parent in a state court custody proceeding, is to affirm the dependency order, vacate the disposition order's out-of-home placement, and remand for a determination of

---

[6] Https://www.indianaffairs.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf [https://perma.cc/3AJ5-PBCA].

No. 39095-1-III
*In re Dependency of J.R.*

whether returning the child to the parent would subject the child to substantial and immediate danger or threat of danger. *A.L.K.*, 196 Wn.2d at 703; 25 U.S.C. § 1920; RCW 13.38.160.

We reverse the disposition order and remand with directions to immediately return J.R. to a parent's care unless the court finds that doing so would subject her to a substantial and immediate danger or threat of such danger.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, A.C.J.

Staab, J.

15