IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of: | ) | No. 39603-7-III |
| | ) | |
| A.T. | ) | PUBLISHED OPINION |
| | ) | |

PENNELL, J. — A.T. is an Indian child as defined by the federal Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, and the Washington State Indian Child Welfare Act (WICWA), chapter 13.38 RCW. After a dependency fact-finding and disposition hearing, the juvenile court found A.T. was dependent and ordered out-of-home placement due to safety concerns prompted by signs that A.T.'s father has significant untreated mental illness.

A.T.'s father appeals, primarily arguing the Department of Children, Youth, and Families failed to engage him in active efforts to prevent the breakup of A.T.'s family. We agree with the father in part.

We agree the Department fell short on its obligation to provide active efforts. Although the Department's social workers worked extensively with the father, they never specifically engaged the father in an effort to help him overcome his aversion to mental

No. 39603-7-III
*In re Dependency of A.T.*

health treatment. While the father could not be ordered to complete mental health services prior to the court's dispositional order, this did not excuse the Department from actively encouraging voluntary participation in services so as to avoid out-of-home placement.

Although we disagree with the juvenile court's finding regarding active efforts, we nevertheless affirm A.T.'s out-of-home placement. At the conclusion of the dependency fact-finding hearing, the juvenile court found that returning A.T. to his father's care would subject him to substantial and immediate danger or threat of such danger. This finding was amply supported by the record. Thus, the juvenile court was justified in ordering that A.T. be placed out of the home, despite the absence of active efforts. *See* 25 U.S.C. § 1920; RCW 13.38.160.

## FACTS

A.T. is an Indian[1] child under ICWA and WICWA. He has spent most of his life in the exclusive care of his father. His mother has had limited involvement. A.T. was

---

[1] "Indian" is the statutory term of art used in ICWA and WICWA. *See In re Dependency of R.D.*, 27 Wn. App. 2d 219, 230 n.7, 532 P.3d 201 (2023) (citing 25 U.S.C. § 1903(4); RCW 13.38.040(7)). A.T. is an Indian child because his maternal grandmother is an enrolled member of the Oglala Sioux Tribe. *See In re Dependency of Z.J.G.*, 196 Wn.2d 152, 174-75, 471 P.3d 853 (2020) (noting ICWA and WICWA apply whenever a court has reason to know a child has tribal heritage); *In re Adoption of T.A.W.*, 186 Wn.2d 828, 847, 383 P.3d 492 (2016) (noting, for purposes of ICWA and WICWA, an "Indian family" is an Indian child's family, regardless of the parent's Indian status).

2

removed from his father's home shortly after his eighth birthday based on health and safety concerns.

*Facts leading up to A.T.'s removal*

The Department has been involved with A.T. and his family since A.T.'s birth. A.T. has eye conditions that place him at risk of vision loss. He had surgery as a toddler, but still requires regular checkups and monitoring. Over the course of his life, A.T.'s father has struggled to facilitate necessary eye care for A.T. But in prior involvement with the Department, the father had been responsive to A.T.'s eye care needs when prompted to take action. *See* 1 Rep. of Proc. (RP) (Dec. 8, 2022) at 107.

A.T.'s father was born in Brazil and spent much of his childhood in a Brazilian orphanage. The father was adopted by an American family and moved to Spokane when he was approximately 10 years old. When he came to the United States of America, the father had limited English proficiency. He was often bullied at school. As an adult, A.T.'s father has shown to be extremely distrustful of government officials, and he is fearful of institutions.

While the father's traumatic childhood has likely contributed to his distrust of government, individuals who have worked with the father believe the father's distrust is also rooted in ongoing "mental health" issues. *See* 1 RP (Dec. 8, 2022) at 47; 1 RP

(Dec. 20, 2022) at 358, 435. The father frequently exhibits paranoia; grandiose thinking; persecutory delusions; pressured, rapid speech; and erratic behavior. He often expresses the belief he is being surveilled or bugged by government agencies. For example, during the course of this dependency the father revealed he had dismantled the smoke detectors in his apartment and was storing them in his dishwasher in order to prevent government surveillance.

Although the father's apparent mental health struggles are both obvious and significant, he is not involved in mental health treatment. Social workers have discussed mental health concerns with the father, but he has always said he is "not interested" in any help. 1 RP (Dec. 8, 2022) at 73; *see also* 1 RP (Dec. 20, 2022) at 422-23. The Department's social workers have deferred to the father's wishes, reasoning he has the "autonomy and self-determination to decline" services. 1 RP (Dec. 8, 2022) at 74. There is no evidence in the record before us that any of the Department's social workers have ever worked with the father to encourage him to rethink his resistance to mental health assistance.

In May 2022, Department social worker Shalana Zackuse began working with A.T. and his father after receiving a report of concern about the father's apparent "mental health paranoia." *Id.* at 20. During a family visit, Ms. Zackuse discovered A.T. was not

enrolled in school, nor had he received any medical care since the onset of the COVID-19 pandemic. The father claimed he was homeschooling A.T. because he feared public school educators were "programming" his son. *Id.*

Ms. Zackuse worked with the father to address issues regarding school and A.T.'s health. She explained homeschooling requirements and advised about the possibility of online and tribal schools. Ms. Zackuse drove the father to an eye clinic so he could attempt to reestablish A.T.'s eye care. And she engaged in other efforts to address the family's needs, including facilitating access to housing assistance, clothing, and hygiene supplies.

Throughout her work with the family, Ms. Zackuse struggled to engage the father in conversations about his need for services. The father has a pressured speech pattern marked by nonlinear and paranoid thought processes. He generally dominates conversations, making it hard for others to participate. Ms. Zackuse found the father's problematic speech pattern would "escalate[]" when she talked about resources. *Id.* at 27.

While reviewing the family's case file, Ms. Zackuse discovered a note mentioning a 2021 police report. Further investigation revealed the report included an allegation that A.T. had told a neighbor "his best friend is his dad's wiener and . . . he likes to play with his dad." *Id.* at 33. This caused Ms. Zackuse to become concerned about the possibility of

sexual abuse. She arranged to meet the father at his home on September 8, 2022.

A second social worker accompanied Ms. Zackuse to the visit.[2]

*The September 8, 2022, home visit and emergency removal*

At this September 8 meeting, the father cycled between periods of agitation and

relative calm. Ms. Zackuse noticed the father seemed more paranoid than usual, and she

grew concerned because the content of the father's delusions had begun to be targeted

at the Department and herself. For instance, he claimed Department employees are all

preprogrammed "slaves." *Id.* at 37. The father told Ms. Zackuse he believed she had

been sent by his own father, and informed her he "wasn't afraid to go to jail." *Id.* at 44;

*see id.* at 34.

During the visit, the father met with the social workers in a bedroom and tried to

keep the social workers away from A.T. Eventually, A.T. wandered into the bedroom

and Ms. Zackuse noticed the child had bruising under his right eye. The father explained

the bruise was the reason he did not want them to see A.T. According to the father, the

previous night he had been teaching A.T. to sweep when he accidentally struck him in

---

[2] It was not typical for two social workers to jointly visit a parent's home, but
the Department had instituted an unofficial policy of not allowing its female employees
to be alone with the father after he purportedly made "inappropriate comments" to a prior
social worker. 1 RP (Dec. 8, 2022) at 34.

the face with the end of the broom handle. The father "found it suspicious" the social

workers had come to his home on a day that A.T. had a visible injury. *Id.* at 34. The father

believed the Department knew about A.T.'s black eye in advance because they had been

surveilling him in his home. The father forbade the social workers from asking A.T. about

the injury.

The conversation was moved to the living room and, at that point, Ms. Zackuse

became concerned A.T. was engaging in sexualized conduct. A.T. straddled his father's

lap while thrusting his hips, and kissed his father's neck while caressing his chest and

face. When Ms. Zackuse mentioned her concern about potential sexual abuse, the father

denied the implication, stating, "children are preprogrammed sexually" and that he and

A.T. "are just very affectionate." *Id.* at 43. The father told Ms. Zackuse he had been

"dabbling" in MDMA (3,4-methylenedioxymethamphetamine), also known as ecstasy,

*id.* at 39, and told her he used drugs in the bedroom, away from his son. *Id.* at 42.

Ms. Zackuse also grew alarmed for A.T.'s physical safety based on the father's use

of the word "'sacrifice.'" *Id.* at 35. According to Ms. Zackuse,

> [The father] was talking about me being sent there by his dad and his dad
> is part of the elites and the Feds, and in regards to the insurance money, the
> millions of dollars of insurance money on [A.T.]. And that he needed to just
> sacrifice [A.T.] and get rid of him so that he could just get the money.
> . . . .
> . . . I asked him, like, what did he mean by sacrifice . . . . And he said that,

7

oh, I just mean, like, give him to my dad so he can go to foster care.

*Id.* Based on her interactions with A.T. and his father, Ms. Zackuse made a referral to the county's crisis response team. Mental health professionals and uniformed law enforcement officers responded to the family home later that evening.

The law enforcement officers immediately suspected the father of being under the influence of drugs. This was based not only on the father's rapid and pressured speech pattern, but also on a strong chemical smell coming from the father's bedroom that was consistent with methamphetamine.[3] During the intervention, the father also admitted to using an unnamed substance.

The crisis responders were unable to engage A.T.'s father in a productive conversation. He talked about conspiracies, socialism, and his belief that people had come to his door asking to buy A.T. The responders noted the apartment's kitchen was mostly devoid of food, and all of the smoke detectors had been dismantled or covered in paper. Based on their observations, the police decided to effectuate an emergent removal of A.T. that night.[4]

---

[3] The father subsequently admitted to "heavy" use of methamphetamine. 1 RP (Dec. 15, 2022) at 260.

[4] A.T. was placed with his paternal aunt the next day. By mid-November, the aunt found herself unable to manage A.T.'s behavior, and A.T. was eventually placed in a foster home.

*Post-removal facts and the dependency process*

Post-removal interactions with A.T. revealed signs of medical and emotional neglect. In addition to his untreated eye conditions, A.T. was thin and poorly groomed. His skin was scarred by apparent insect bites and he had significant tooth decay. A.T.'s speech was delayed and it was discovered his academic performance and social development were at a kindergarten or pre-kindergarten level. A.T. had significant trouble regulating his emotions and often engaged in conduct similar to that of a toddler. A.T.'s care providers found he sometimes smeared feces and exhibited sexualized conduct.

The Department petitioned for dependency, alleging A.T. was dependent on the basis of having no parent capable of adequately caring for him such that he was in danger of substantial damage to his development. *See* RCW 13.34.030(6)(c).[5] The Department alleged A.T. would be at "significant risk" of damage if returned to his father, on the basis of "unaddressed mental health, . . . substance use, concerns of abuse, [and] instability/chaotic lifestyle." Clerk's Papers (CP) at 3.

An uncontested shelter care hearing was held on September 14, 2022. At the

---

[5] The petition also alleged abuse and neglect as bases for dependency, *see* RCW 13.34.030(6)(b), but the juvenile court treated the petition as invoking only the subsection (6)(c) basis. Just over two months after the petition was filed, A.T.'s mother stipulated to entry of an order of dependency and disposition order for out-of-home placement.

hearing, the juvenile court found it would be contrary to A.T.'s welfare for him to return home and that continued out-of-home placement was necessary to prevent imminent harm. The Department recommended the father participate in (1) a chemical dependency assessment and any recommended treatment, (2) random urinalysis (UA) testing, (3) a parenting assessment, (4) an evidence-based parenting program, (5) mental health treatment, (6) a domestic violence assessment, (7) a neuropsychological evaluation, and (8) a sexual deviancy assessment, along with following the recommendations of any providers. Of these recommended services, the father agreed only to the evidence-based parenting program. The court granted the father three supervised visits with his son per week.

Justyna Dokken was the social worker assigned to the dependency. Ms. Dokken immediately recognized reliable communication might be a barrier for the father, so she procured a mobile phone for him with prepaid minutes, and helped him set the phone up. The father believed he should have been provided an Apple iPhone instead of an Android phone because "Android in itself is socialism." 1 RP (Dec. 15, 2022) at 292. When the father told her he wanted a planner, Ms. Dokken procured one for him and filled in all of A.T.'s appointments, as well as the father's own assessments, into its pages.

For the first two months of the dependency, Ms. Dokken communicated with the

father several times per week, via phone calls, text messages, and in-person meetings, and maintained at least weekly contact in the following months. Due to the father's speech patterns, each phone call and in-person meeting typically lasted one to two hours. At numerous meetings, Ms. Dokken provided the father with written lists of providers for each of the Department's recommended services, along with instructions for how to contact such providers and make appointments. She also offered to call providers, including mental health professionals, with the father. Despite these offers, the father persistently denied any need for most services—including a chemical dependency evaluation, mental health treatment, domestic violence assessment, neuropsychological evaluation, and sexual deviancy assessment.

The father was willing to do one UA exam in late September. When the father needed a ride to the testing facility, Ms. Dokken personally drove him there. Ms. Dokken parked outside the facility, but when she noticed the father had entered a neighboring building by mistake, she got out of the car and steered him to the correct entrance. When the father came back out, Ms. Dokken drove him to the nearest bus stop to show him where it was in case he returned on his own for another UA exam, and gave him prepaid bus passes. The result of this UA exam was negative for all substances, but the father has not participated in any further testing.

On October 3, 2022, the father participated in an intake session for an evidence-based parenting program. The service provider was unable to complete the intake because the father's pattern of rapid and pressured speech prevented the provider from obtaining necessary information. The father insisted on discussing his conspiracy theories about the Department. He also made comments about the female service provider's body and talked about how much he loved women. The service provider ultimately concluded the father's mental health would need to stabilize before he could meaningfully participate in any parenting program. The provider recommended that a neuropsychological evaluation be conducted first before making any further attempts to work on the father's parenting skills.[6]

Ms. Dokken summarized her efforts to engage the father with services as follows: she provided service letters and referrals for services; she scheduled appointments and offered to call service providers; she helped with transportation, both by giving the father rides and providing bus passes; she sent the father text messages to remind him of appointments; and, upon his request, Ms. Dokken provided the father with a prefilled daily planner. Specific to mental health, Ms. Dokken described her efforts to provide

---

[6] The Department arranged for the father to meet with another provider for a parenting assessment, who made a similar recommendation.

services as:

> I have provided service letters on I believe four or five occasions, I believe
> four. And discussed . . . the list of providers with him and offered to make
> those calls with him. He's declined to engage in mental health [services]
> and declined my assistance in calling providers.

1 RP (Dec. 20, 2022) at 470. There is no indication Ms. Dokken worked with the father

to otherwise help him overcome his resistance to mental health treatment.

The father has been a difficult client for Ms. Dokken. Given his rapid speech

pattern and insistence on discussing government conspiracies, conversations are often

long and unproductive. To make things worse, the father's interactions with Ms. Dokken

have been peppered with inappropriate sexual comments. The father has sent Ms. Dokken

text messages commenting on her physical appearance. And he has told Ms. Dokken's

coworkers they need to "keep [her] single." *Id.* at 447. Ms. Dokken does not feel safe

being alone with the father. As a result, she always has a second social worker accompany

her on visits with the father.

Throughout the dependency, Ms. Dokken has prioritized facilitating the court-

ordered visitation between A.T. and his father. As has been true for other services, this

has been extremely difficult. A.T. has often engaged in disruptive outbursts during

visitation and expressed anger or frustration with his father, which the father has proved

unable to manage. Meanwhile, the father has attempted to engage with visitation

supervisors through inappropriate conversations about the dependency process and

lengthy conversations about various conspiracies. The visitation facility that originally

picked up the ongoing referral cancelled regular visits, and multiple other agencies

thereafter expressed an unwillingness to work with the father on an ongoing basis.

But Ms. Dokken worked creatively and diligently to arrange for alternate visitation

opportunities through medical appointments, one-time emergent visits, and offers for

visits directly supervised by herself.

*Review hearings and fact-finding hearing*

The juvenile court held two review hearings between the initial shelter care

hearing and the dependency fact-finding hearing. One occurred in October and the other

in November. At each of the hearings, the juvenile court found active efforts had been

made. *See* CP at 135, 165-66. The description of active efforts was largely identical in

both the October and November orders. The court summarized the Department's active

efforts as:

> [C]onsistent communication with the parents including in person and in
> writing, ensuring the parents are aware of all of the child's appointments
> and have an opportunity to attend, timely referrals for services, including
> all recommended services, offering to call and calling service providers to
> determine availability, multiple referrals to visitation providers, providing
> phone and minutes and assisting with activation, providing bus passes and

> gas cards, providing transportation to services, conduct FTDM,[7] inviting
> Tribe to shared planning and all hearings, placing the child with relative
> and supporting that placement by assisting with daycare and transportation,
> providing concrete goods, referring for home study, enrolling child in
> school, and ensuring his educational and medical referrals and appointments
> are addressed.

*Id.* at 135.[8] The court in its November order found that returning A.T. back home would subject him to "substantial and immediate danger" based on the father's "unaddressed mental health, unmitigated substance use and . . . unwilling[ness] to change behaviors that impact child safety and welfare." *Id*. at 166.

The dependency fact-finding hearing was held in December 2022 and lasted several days. Witnesses testified consistent with the above summary. One of the witnesses was a qualified expert witness (QEW) under ICWA and WICWA. The QEW testified he believed removal from the home was in A.T.'s best interest, and opined that continued custody of A.T. by his father would likely result in serious emotional or physical damage to the child.

The juvenile court commissioner found, by a "preponderance of the evidence," that A.T. was dependent, that the State had provided active efforts to prevent the breakup

---

[7] Family team decision making meetings.
[8] The orders also incorporated declarations by Ms. Dokken, which provided additional details.

of A.T.'s family, and that thus far such efforts had been unsuccessful. *Id.* at 359-60.

The court cited the state of the father's mental health as the primary factor obstructing his

ability to adequately care for A.T. According to the court, the father "has not made any

progress in addressing or mitigating the challenges [that] brought [A.T.] out of his care."

*Id.* at 379.

The court further found "by clear, cogent, and convincing evidence" that returning

A.T. to his father would likely result in serious emotional or physical damage to the child.

*Id.* at 360.[9] The court also found that A.T. would be in "substantial and immediate danger

or threat of such danger should he be returned to [the father's] care." *Id.*[10]

The court ordered a neuropsychological evaluation of the father and 30 days of

random UA testing. The court declined to order any other services, pending the results

of the neuropsychological exam.

The father timely appeals.

---

[9] This finding is required any time the court orders out-of-home placement of an Indian child. *See* RCW 13.38.130(2).

[10] This finding is required where out-of-home placement has been improperly ordered; for example, if the Department has not satisfied its obligation to provide active efforts. RCW 13.38.160. The juvenile court made this finding under RCW 13.38.160, despite also finding the Department had satisfied active efforts, at the request of the State.

ANALYSIS

There are two stages to a dependency fact-finding and disposition hearing. First, the Department must establish a child meets one of the definitions of "[d]ependent child" under RCW 13.34.030(6). This finding must be made by a preponderance of the evidence. RCW 13.34.130.

The second step of the dependency process is the disposition. Disposition involves issues such as the child's placement, visitation, and the parents' service plan. A dependency does not require a child be placed out of home. *See* RCW 13.34.130(1)(a). But before an out-of-home placement may be ordered, ICWA and WICWA demand additional protections for Indian families. First, the juvenile court must find that active efforts have been made to prevent the breakup of the family. RCW 13.38.130(1); 25 U.S.C. § 1912(d). Second, the court must find "by clear and convincing evidence" that continued custody by the child's parents "is likely to result in serious emotional or physical damage to the child." RCW 13.38.130(2); 25 U.S.C. § 1912(e). If active efforts have not been provided, the court may not order out-of-home placement unless it finds the child would be in "substantial and immediate danger or threat of such danger" in the parents' care. RCW 13.38.160; 25 U.S.C. § 1920; *see In re Dependency of A.L.K.*, 196 Wn.2d 686, 703-04, 478 P.3d 63 (2020).

The father does not challenge the trial court's finding that A.T. meets the

definition of a "[d]ependent child" under RCW 13.34.030(6). Instead, he first argues

the Department failed in its obligation to provide active efforts. He also challenges

the trial court's determinations that A.T. would (1) suffer likely damage in his care, and

(2) be in substantial and immediate danger in his care. We address each claim in turn.

*Active efforts*

Both ICWA and WICWA require the Department to engage parents in "active

efforts . . . designed to prevent the breakup of the Indian family." RCW 13.38.130(1);

25 U.S.C. § 1912(d).[11] Under WICWA, the active efforts requirement applies any time

the court orders an out-of-home placement of an Indian child, including at shelter care

and dependency fact-finding hearings. *See In re Dependency of J.M.W.*, 199 Wn.2d 837,

847, 514 P.3d 186 (2022). If the Department has contact with a family that raises a

"reason to believe" a child is "at risk of physical damage or harm," it has "an obligation

to at least begin active efforts to avoid breaking up the family." *Id*. at 848.

"*Active efforts* means affirmative, active, thorough, and timely efforts intended

primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2.

---

[11] Both ICWA and WICWA apply to juvenile courts in Washington. "We apply the provision that offers greater protections to Indian families." *In re Dependency of G.J.A.*, 197 Wn.2d 868, 907, 489 P.3d 631 (2021).

18

Active efforts must be "timely and diligent," RCW 13.38.040(1)(a), and "tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2. The Department must not only identify appropriate services for a parent, but work with the parent to "overcome barriers" to the provision of services. 25 C.F.R. § 23.2(2); *see In re Dependency of R.D.*, 27 Wn. App. 2d 219, 233-34, 532 P.3d 201 (2023). Mere referrals to services are not enough. RCW 13.38.040(1)(a)(ii); *R.D.*, 27 Wn. App. 2d at 234. Furthermore, if "optimum services" for the family "do not exist or are not available," active efforts will involve "[c]onsidering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family." 25 C.F.R. § 23.2(10).

To satisfy the active efforts requirement, the Department must "meaningfully engage" with a parent to address the services necessary for family reunification. *In re Dependency of G.J.A.*, 197 Wn.2d 868, 895, 489 P.3d 631 (2021). Remedial services can include "individual, group, and family counseling; substance abuse treatment services; mental health services; assistance to address domestic violence; services designed to provide temporary child care and therapeutic services for families; and transportation to or from any of the above services and activities." RCW 13.34.025(2)(a). An assessment to determine necessary services is not, in and of itself, a remedial service. *A.L.K.*, 196 Wn.2d at 708 (Montoya-Lewis, J., concurring).

No. 39603-7-III
*In re Dependency of A.T.*

Whether the State satisfied the active efforts requirement is a mixed question

of law and fact. *A.L.K.*, 196 Wn.2d at 697. "We review the underlying findings for

substantial evidence, but review de novo whether those findings satisfy the requirements

of ICWA" and WICWA. *In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 37, 456 P.3d

820 (2020), *overturned in part on other grounds by G.J.A.*, 197 Wn.2d at 901 n.16, 906

n.17.[12]

---

[12] A.T.'s father argues the State is required to prove it provided active efforts by clear, cogent and convincing evidence. We have previously opined as much, but those holdings arose in the termination context rather than, as here, in an appeal from a dependency fact-finding hearing. *See, e.g.*, *D.J.S.*, 12 Wn. App. 2d at 28; *In re Dependency of A.M.*, 106 Wn. App. 123, 134-35, 22 P.3d 828 (2001). By contrast, the United States Department of the Interior, Bureau of Indian Affairs "favorably views cases that apply the same standard of proof for the underlying action to the question of whether active efforts were provided (i.e., clear and convincing evidence for foster care placement and beyond a reasonable doubt for [termination of parental rights])." U.S. BUREAU OF INDIAN AFFS., DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 44 (2016), https://www.bia.gov/sites/default/files/dup/assets/as-ia/raca/pdf/Guidelines%20for%20Implementing%20ICWA_2016_OIS%20BIA.pdf.
The question of whether the services provided by the Department constitute active efforts is one of law, which is not subject to a burden of proof. *See In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 872, 439 P.3d 694 (2019). There is an antecedent factual question: What did the Department do to provide services and when did they do it? *See id.* But, as is true here, those facts are rarely disputed. In such a case—where the parties disagree only about the legal component of the active efforts inquiry—it does not make sense to split hairs over which standard of proof applies to the factual component.

The question of active efforts in this case is complex. Before the emergency removal of A.T. from his father's home in September 2022, the Department likely satisfied its obligation. During the period of May through early September 2022, Ms. Zackuse was aware that the father was distrustful of the government due to apparent mental health struggles and that he refused treatment. Nevertheless, it appeared—based on his history with the Department—that the father would be able to safely parent A.T. if provided support such as help with appointments, transportation to services, and information about schooling options. Thus, Ms. Zackuse acted accordingly.

But early in September, things changed. At that point, the father's seemingly worsening mental state and distrust of government required an intervention by a mental health crisis team and an emergent removal of A.T. from the home. At that point, it was apparent the father's untreated mental health problems had become a significant barrier to family unity. Thus, at that point, ICWA and WICWA obliged the Department to start engaging the father in an effort to overcome his resistance to mental health treatment.

The Department did a lot of work with the father after A.T. was removed from his care. Much of the work was aimed at facilitating visitation. Ms. Dokken worked tirelessly and creatively to arrange for visits between A.T. and his father even after local visitation providers proved unwilling to facilitate visits on an ongoing basis. Ms. Dokken arranged

for emergent visits between father and son and offered to have visits take place under the Department's direct supervision. Ms. Dokken also helped the father arrange for a parenting assessment and an intake with an evidence-based parenting program. And she personally drove him to a facility for his UA test. Ms. Dokken frequently met with the father and listened to his concerns, despite the fact that he was often inappropriate and even made her feel unsafe.

But for everything Ms. Dokken and the Department did with the father, they did not actively engage him on the issue of mental health services. Ms. Dokken testified that when it came to mental health, she provided the father with service letters, discussed the list of providers and offered to make phone calls. This is similar to what Ms. Zackuse had done with respect to mental health prior to A.T.'s removal. Yet plainly, this type of effort was not sufficient to help the father overcome his resistance to services. Something new needed to be tried.

It is not uncommon for a parent to decline family preservation services. *G.J.A.*, 197 Wn.2d at 903, 905-06. The Department "should expect resistance from parents." *A.L.K.*, 196 Wn.2d at 707 (Montoya-Lewis, J., concurring). Nevertheless, the duty to provide active efforts persists. *See G.J.A.*, 197 Wn.2d at 875 (holding the Department's duty to provide active efforts to Indian families is not excused by apparent futility).

22

ICWA and WICWA demand case workers keep working with a parent despite the parent's rejection of services or failure to engage satisfactorily. *A.L.K.*, 196 Wn.2d at 699-700.

Given that social workers are obliged to persistently engage the parents of Indian children, the active efforts requirement means the Department's workers must engage in self-evaluation, reflection, and a willingness to change strategy. Active efforts must be meaningful. *G.J.A.*, 197 Wn.2d at 895. This requirement is not met by repeating unsuccessful strategies with the hope of a different result. Rather than continuing with efforts that have previously failed, the active efforts requirement demands case workers brainstorm new strategies, tailored to the specific needs of a particular case.

In this case, the strategy of recommending mental health services and offering to make appointments was tried and failed. Given this circumstance, the Department was obliged to actively reassess the situation and help the father "develop the skills required" to understand the importance of mental health treatment and thereby "keep custody" of A.T. *D.J.S.*, 12 Wn. App. 2d at 31-32.

To be sure, prior to the dependency fact-finding hearing, the father could not be ordered into services without his agreement. *See* RCW 13.34.065(4)(j). But that does not mean the Department was relieved from trying to work with the father and encourage his

voluntary participation in services. The Department's obligation to provide active efforts begins as soon as it has "reason to believe" an Indian child is at risk of harm in their parents' care. *J.M.W.*, 199 Wn.2d at 840, 848.

Our decision should not be interpreted to mean that the Department can prove active efforts by only demonstrating successful engagement. ICWA and WICWA recognize that out-of-home placement will sometimes be required despite the Department's best efforts at family preservation. *See* RCW 13.38.130(1) (contemplating that active efforts might "prove[] unsuccessful"); 25 U.S.C. § 1912(d) (same). Nevertheless, the possibility—and even the seeming probability—of failure "does not excuse" the Department from continuing to try. *G.J.A.*, 197 Wn.2d at 906.

Despite all the work that was done with A.T.'s father, the record fails to show the Department worked to actively engage the father in mental health services in a way that might have helped him overcome his resistance to treatment. We therefore reverse the juvenile court's finding regarding active efforts.

*Remedy for failure to provide active efforts*

In the context of a dependency disposition requiring out-of-home placement, the remedy for the Department's failure to provide active efforts is to return the child home unless doing so "would subject the child to substantial and immediate danger or threat

24

of such danger." RCW 13.38.160; 25 U.S.C. § 1920; *see also A.L.K.*, 196 Wn.2d at 703-04. When an appellate court reverses a juvenile court's findings as to active efforts, the prescribed remedy is to remand for findings under the foregoing standard. *A.L.K.*, 196 Wn.2d at 703-04.

The Department argues remand for this purpose is unnecessary because the juvenile court made sufficient findings to satisfy the "substantial and immediate danger" standard. RCW 13.38.160; 25 U.S.C. § 1920. In its disposition decision, the juvenile court found "[A.T.] is at imminent risk of physical damage or harm and substantial and immediate danger or threat of such danger should he be returned to [the father's] care." CP at 360. We agree with the Department.[13]

The evidence produced during the dependency fact-finding and disposition hearing justified the juvenile court's finding that returning A.T. to his father's care would result in a substantial and immediate danger to the child. A.T. was in dire condition when he was removed from his father's home. He was apparently malnourished, socially and academically delayed, and had not received adequate medical care in several years.

---

[13] For the same reasons that we agree with the juvenile court that A.T. would face a substantial and immediate threat of danger in his father's care, we also agree the Department met its burden to show "continued custody" of A.T. by his father was "likely to result in serious emotional or physical damage." RCW 13.38.130(3); 25 U.S.C. § 1912(e).

The lack of medical care was particularly troubling because, without regular treatment, A.T.'s eye conditions brought a risk of permanent vision loss. Not only had A.T. already suffered in his father's care, the father's paranoia and untreated mental health issues placed A.T. at imminent risk of physical damage or harm. For instance, the father removed smoke detectors from the family residence based on his delusion that the detectors were actually government surveillance devices. This placed A.T. in immediate peril, especially in light of the father's testimony that he uses the oven to heat his home. Based on the record produced at trial, it is apparent that unless the father addresses his mental health, he will not be able to provide a safe living environment for his son. The juvenile court's order authorizing out-of-home placement was justified, the failure to provide active efforts notwithstanding.

## CONCLUSION

We reverse the trial court's findings as to active efforts but nevertheless affirm A.T.'s out-of-home placement pursuant to RCW 13.38.160 and 25 U.S.C. § 1920. Going forward, the Department must do more to engage A.T.'s father in necessary services, especially mental health services. At any future court hearings involving out-of-home placement, the Department must show that it has engaged in active efforts as set forth in this decision. If active efforts have not been met, then A.T. must be returned home unless

No. 39603-7-III
*In re Dependency of A.T.*

the Department remains able to prove that the father continues to pose a "substantial and

immediate danger" to A.T. RCW 13.38.160; 25 U.S.C. § 1920.

_____
Pennell, J.

WE CONCUR:

_____ _____
Lawrence-Berrey, A.C.J.       Staab, J.

27