IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of: | No. 85959-5-I |
| S.A.M-S. | DIVISION ONE |
| | ORDER DENYING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

Appellant, J.M., has moved for reconsideration of the unpublished opinion filed on February 10, 2025. The panel has considered the motion pursuant to RAP 12.4 and has determined that the motion should be denied, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the appellant's motion for reconsideration is denied; and it is further

ORDERED that the unpublished opinion filed on February 10, 2025 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion be filed.

Díaz, J.

Birk, J.

Smith, C.J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>S.A.M-S. | No. 85959-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — After a six day trial, the superior court terminated J.M.'s parental rights to her daughter, S.A.M-S.[1] J.M. and S.A.M-S. are members of a federally recognized tribe. J.M. argues the Department of Children, Youth, and Families (DCYF) violated the Washington Indian Child Welfare Act (WICWA), chapter 13.38 RCW, and its federal counterpart the Indian Child Welfare Act (ICWA), 25 U.S.C., chapter 21, by failing to engage in "active efforts" to prevent the breakup of their family in four ways. J.M. claims DCYF wrongfully transferred her case to DCYF's "permanency unit," failed to investigate the qualifications of her preferred mental health provider, failed to adequately respond to her requests for family therapy, and failed to conduct a complete mental health assessment. J.M. further avers the

---

[1] We use the initials of the mother and daughter to protect their identities.

court's finding that J.M.'s parental deficiencies would not be remedied in the "near future" was unsupported or inappropriately backwards looking, and that the court failed to properly consider a guardianship, rather than termination. While holding the State to the exacting standard demanded by ICWA, WICWA, and our case law interpreting those laws, we disagree with each argument, and affirm the order terminating J.M.'s parental rights to S.A.M-S.

## I. BACKGROUND

J.M. is the mother of S.A.M-S.[2] Both J.M. and S.A.M-S. are members of the Aleut Community of Saint Paul Island in Alaska, a federally recognized tribe.

In April 2020, the Lummi Nation Police Department arrested J.M. after a domestic violence incident. The police report states S.A.M-S. was "exposed to this act of domestic violence," but "looked to be uninjured physically." Immediately after this incident, S.A.M-S. moved in with her grandmother. In August 2020, the court entered an order that placed S.A.M-S. in foster care. In tribal court, J.M. later pleaded guilty to various charges related to the incident, including assault and battery in the third degree with a domestic violence designation and child abuse or neglect.

Contemporaneously, in April 2020, DCYF filed a dependency petition in the Whatcom County Superior Court. In March 2021, J.M. agreed with DCYF to jointly file a stipulated dependency order, which the court later accepted. Pursuant to the stipulation, the court ordered that DCYF provide and J.M. complete various

---

[2] While no father was joined in the dependency case, DCYF obtained an order allowing for notice and termination of the parental rights of any putative father.

services, including:

- Substance abuse treatment, including random urinalysis and hair follicle testing;[3]
- A mental health assessment and any recommended treatment, including "a neuro-psychological evaluation with a parenting component;"
- A domestic violence batterer's assessment and any recommended treatment;[4]
- Age appropriate parenting instruction, including a demonstration of parenting skills during visitation.[5]

Over 18 months later, in November 2022, DCYF filed a petition to terminate J.M.'s parental rights to S.A.M-S. DCYF alleged the parental deficiencies arose from J.M.'s untreated "long-standing mental health issues," and that there were "no indications she has engaged in domestic violence services." DCYF also emphasized that S.A.M-S. had been "dependent for more than 30 months." The following month, the Aleut Community intervened under WICWA and ICWA.

The court held a six-day bench trial in September 2023. The court heard testimony from 12 witnesses. As will be elaborated later, the court heard testimony that S.A.M-S. had already lost one caregiver due to J.M.'s threats and behavior. The court also heard testimony that S.A.M-S. was bonding well with her second caregiver, a tribal family affiliated with the Tlingit Haida tribe, a sister tribe of the Aleut community.

---

[3] J.M. commendably completed a substance use assessment as well as intensive outpatient and relapse prevention treatment. This requirement is not an issue on appeal.

[4] The court found J.M. noncompliant with her domestic violence treatment requirements, and J.M. assigns no error to that finding. But DCYF does not argue and, thus, we do not reach whether J.M.'s failure to comply with this important treatment may be an independent ground to affirm the order of termination. Wash. Prof'l Real Estate, LLC v. Young, 163 Wn. App. 800, 818 fn.3, 260 P.3d 991 (2011); RAP 12.1.

[5] J.M. also completed an age-appropriate parenting instruction. This requirement is not an issue on appeal.

Later that same month, the court entered an order terminating J.M.'s parental rights. J.M. now appeals.

## II. ANALYSIS

### A. Overview of the Principles Governing Termination, WICWA, and ICWA

Courts must be cognizant of a parent's "'fundamental liberty interest in the care custody, and management of their children.'" In re Parental Rights to M.A.S.C., 197 Wn.2d 685, 698, 486 P.3d 886 (2021) (quoting In re Welfare of D.E., 196 Wn.2d 92, 102, 469 P.3d 1163 (2020)). "Likewise, children have 'a vital interest in preventing erroneous termination of their natural relationship' with their parents.'" Id. (internal quotation marks omitted) (quoting D.E., 196 Wn.2d at 103). To effectuate these principles, "[c]hapter 13.34 RCW creates a two-step framework" generally for all termination proceedings. In re Parental Rights to K.M.M., 186 Wn.2d 466, 478, 379 P.3d 75 (2016). The "first step focuses on the adequacy of the parents, while the second step looks at the child's best interests." Id. Further, "[t]o protect the vital interests at stake, 'the burden of proof in a termination trial is on [DCYF] and should never be shifted to the parent.'" M.A.S.C., 197 Wn.2d at 698 (quoting D.E., 196 Wn.2d at 103).

Courts are also bound to apply ICWA and WICWA during termination proceedings involving Indian[6] children. In re Dependency of G.J.A., 197 Wn.2d 868, 887, 489 P.3d 631 (2021). ICWA "did not emerge from a vacuum." Haaland

---

[6] We follow our Supreme Court guidance and "use the term 'Indian' when referring to the statutory language contained in the Indian Child Welfare Act and Washington State Indian Child Welfare Act . . . In all other areas, we use the term 'Native.'" In re Dependency of G.J.A., 197 Wn.2d 868, 873 n.1, 489 P.3d 631 (2021).

v. Brackeen, 599 U.S. 255, 297, 143 S. Ct. 1609, 216 L. Ed. 2d 254 (2023) (Gorsuch, J., concurring). Congress passed ICWA in "direct response to the mass removal of Indian children from their families during the 1950s, 1960s, and 1970s by state officials and private parties" which "was only the latest iteration of a much older policy of removing Indian children from their families—one initially spearheaded by federal officials with the aid of their state counterparts nearly 150 years ago." Id.; G.J.A., 197 Wn.2d at 875 ("[t]hrough the passage of ICWA and [WICWA], Congress and the Washington State Legislature intended to redress our nation's long-standing and widespread abusive practice of removing Native children from their families and destroying Native communities.").

ICWA, and subsequently WICWA, aims to address how "'States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families'" and to "preserve tribal sovereignty and Native families." G.J.A., 197 Wn.2d at 873 (alteration in original) (quoting 25 U.S.C. § 1901(5)), 886. "Where ICWA and WICWA differ, the court applies the provision that offers greater protections to Indian families." Id. at 886.

B.      WICWA and ICWA's Active Efforts Requirement

Of the obligations ICWA and WICWA impose, most relevant to this appeal is the requirement that "[t]hroughout the dependency, the state agency is required to engage in active efforts to reunite the family." Id. at 887. This requirement means DCYF must "engage the parent in a thorough, timely, consistent, and culturally appropriate manner to help reunify the Indian family if the conclusion of

the dependency court is that the children must be removed from the care of their parent(s)." Id. at 888.

Active efforts also "'should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe.'" Id. at 889 (quoting 25 C.F.R. § 23.2). Further, active efforts must reflect "deference to the tribe at each step of the dependency, including determination of Indian status, placement, and services." Id. at 887; see also RCW 13.38.040(1)(a) (adding that the services offered "shall include those services offered by tribes and Indian organizations whenever possible.").

The overall "purpose of the active efforts standard is to '*prevent* the breakup of the Indian family.'" Id. at 890 (quoting 25 U.S.C. § 1912(d); RCW 13.38.130(1)). "[A]ny delay in adequately engaging the parent or failure to do so in a culturally appropriate manner only accelerates the destruction of the Native family's cultural identity and ties to their community." Id. at 888. Further, our Supreme Court has described active efforts as the "'gold standard'" of child welfare and "one of the most important protections under ICWA and WICWA." Id. at 888 (quoting BUREAU OF INDIAN AFFAIRS, US DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 39 (2016)).

When courts assess DCYF's fidelity to engage in active efforts, "ICWA and WICWA do not permit the application of the futility doctrine." Id. at 875. As our Supreme Court explained, native parent's "distrust continues to permeate today, and Native families often do not trust child welfare workers," meaning "[a]pplication of the futility doctrine would only perpetuate trauma and distrust." Id. at 906. As

6

such, DCYF "is not excused from providing active efforts unless it can demonstrate to the court it has made sufficient efforts and those efforts 'have proved unsuccessful.'" Id. at 875 (quoting 25 U.S.C. § 1912(d); RCW 13.38.130(1)). In other words, a "parent's action, inconsistency, or inaction does not excuse [DCYF] from providing active efforts." Id. at 876.

Whether DCYF engaged in active efforts is a mixed question of law and fact. In re Dependency of A.L.K., 196 Wn.2d 686, 697, 478 P.3d 63 (2020). We review the underlying findings for substantial evidence, but review de novo whether those findings satisfy ICWA and WICWA. Id.

"Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise." In re Welfare of A.B., 181 Wn. App. 45, 59, 323 P.3d 1062 (2014). In gauging whether there is substantial evidence for a court's findings, "[w]e do not make credibility determinations or weigh evidence." Id. at 60. We "defer to the trial court's weighing of the evidence and witness credibility determinations." In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020).

Here, the court generally found that "DCYF made active efforts" and "has worked in close collaboration with the Aleut Community of St. Paul Island Tribe since the inception of the underlying dependency" and the tribe "supports the finding of active efforts." J.M. argues the court erred in so finding, making four overarching arguments. All four are unavailing.

1. Permanency Unit Transfer[7]

---

[7] DCYF argues that J.M.'s argument on the permanency unit transfer is

J.M. first argues that DCYF displayed an "obvious intention to break up [her] Indian family . . . when it moved her case into [the permanency] unit designed to have cases end in adoption or guardianship," which essentially "fast track[ed]" the matter and "put a thumb on the scale" towards termination. As such, J.M. argues the decision to move her case to the permanency unit "undercuts any active efforts finding." We disagree for three reasons.

First, J.M. fails to cite any legal authorities beyond a generalized invocation of the principles of WICWA and ICWA discussed in G.J.A. and Haaland. J.M. cites no authority holding that any type of purely administrative decision can violate WICWA or ICWA, nor does she point to any specific "statutory duty" in ICWA or WICWA which the decision violated. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

Second, DCYF's "decisions about how to manage internal resources, including decisions about what staff is to be assigned to what cases, fall squarely within the purview of the executive branch." In re Dependency of W.W.S., 14 Wn. App. 2d 342, 367, 469 P.3d 1190 (2020). This discretion is codified at RCW 43.216.025(3), which states that "[u]nless specifically limited by law, the secretary

_____

"unpreserved" as it was not raised below. J.M. acknowledges that there was "no contemporaneous request to dismiss the termination" on this basis. But J.M. asks us to exercise our discretion because the "implications regarding ICWA and WICWA justify this Court's review." Given the stakes at issue in this case, we choose to exercise our discretion to consider this issue. RAP 2.5(a) (this "court *may* refuse to review any claim of error which was not raised in the trial court.") (emphasis added).

has the complete charge and supervisory powers over" DCYF. Here, J.M. fails to identify any limit in the law, specific or otherwise, which curtails DCYF discretion.

J.M. responds that courts may "intercede to protect the rights of individuals when the state agency acts . . . 'are . . . predicated upon a fundamentally wrong basis.'" (Quoting Coal. for the Homeless v. Dep't of Soc. & Health Servs., 133 Wn.2d 894, 913-14, 949 P.2d 1291 (1997)). And J.M. simply asserts the transfer was "fundamentally wrong."

J.M., however, provides no citation to the record explaining why it was fundamentally wrongly or what effect it had on DCYF's engagement with J.M. On the contrary, J.M.'s counsel conceded at oral argument that they "don't have . . . anything in the documentation in the record" as to *how* the transfer affected DCYF's active efforts, other than possibly reflecting implicit bias. Wash. Ct. of Appeals oral argument, Dependency of: S.A.M-S., No. 85959-5-I (November 6, 2024), at 3 min., 31 sec. through 3 min., 53 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024111126/?eventID=2024111126. We decline to comb the record to find support for appellant's argument that the decision was "fundamentally wrong" where J.M. points to no discernable effect from the action, or to any evidence that the decision arose from implicit bias. Fishburn v. Pierce County Planning & Land Servs. Dep't, 161 Wn. App. 452, 468, 250 P.3d 146 (2011).[8]

---

[8] To be clear, we are not saying that the failure to explain why the State's placement of J.M.'s case in that unit precludes review all together. We agree with our sister division that "courts have been specially charged with monitoring compliance with ICWA and WICWA regardless of the parties' compliance with expectations regarding error preservation" and that, *as we next do*, "we will

Third, the testimony of DCYF's Katherine Graff—uncontested at trial and unchallenged on appeal—provides substantial evidence that the decision to transfer J.M.'s case rather than undercut the court's active efforts finding, actually supports it.

Graff, a supervising social worker with over 19 years of experience, testified that that "specific unit was becoming known as a permanency unit, so . . . I was going to be supervising both adoption-focused cases as well as [Child and Family Welfare Services] cases."  The name "permanency unit" was "an internal change by [DCYF], but it was certainly related to a lot of recent legislation in the last few years that has appropriately decreased the number of adoptions, and focused more on guardianship cases, and so we recognized that the unit was going to be handling both."  This testimony contradicts J.M.'s argument that the unit itself "creates a perverse incentive to err on the side of removal."

As for DCYF's decision to transfer J.M.'s case, Graff testified that the case "came to our unit in February of 2023," was transferred to her when the previous social worker ended their employment in May, and that it was "not typical[]" for a supervisor like her to take a case like J.M.'s.  She took on J.M.'s case because it had "been a very difficult case for social workers to hold" due to the "number of

---

independently review the record to discern whether [DCYF] complied with the active efforts requirement."  In re Dependency of R.D., 27 Wn. App. 2d 219, 233, 532 P.3d 201 (2023).  However, where a party clearly identifies the alleged failure to engage in active efforts (here, e.g., placing J.M.'s case in the permanency unit), the party must still provide "reference[s] to the record" or "citation [to] authority."  Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).  Otherwise, we need not consider the claim more than it was argued by the interested party.  Id.

threats that have occurred," causing previous social workers and other DCYF staff to leave the case. Graff testified that she "had to make a decision as to whether I would reassign this case to someone else, and possibly risk losing other staff" or "continue to carry the case, myself, rather than put another person in that position." This testimony undermines J.M.'s claim that DCYF transferred the case to fast track it towards termination. Rather, there is substantial evidence that the transfer balanced J.M.'s behavioral health issues and DCYF's staffing challenges.

In short, we hold the above evidence was "sufficient to persuade a fair-minded rational person" that DCYF's decision to transfer J.M.'s case to the permanency unit was not inherently in conflict with its duty to engage in active efforts to unite J.M.'s family, as she claims. A.B., 181 Wn. App. at 59.

2. Family Therapy

J.M. next argues DCYF failed to adequately respond to her requests for family therapy with S.A.M-S. in contravention of WICWA and ICWA. J.M. cites to our Supreme Court's holding that active efforts "are not limited to court-ordered services . . . but 'must necessarily encompass *all* barriers to reunification.'" (Quoting G.J.A., 197 Wn.2d at 897). She argues that, although "[DCYF] should have been aware of the weakening bond between [J.M.] and S.A.M-S," DCYF "unilaterally determined" family therapy was not appropriate and "did not make a referral or any effort to provide this service" or otherwise "work with [J.M.] on her request." We disagree.

The court found that J.M. indeed "requested the additional service of family therapy but given the context of when these requests were made – during

11

escalated email communications which also contained numerous threats against multiple individuals – this is not a service that is or would have been capable of correcting [J.M.'s] parental deficiencies" as "[h]er underlying trauma must be adequately treated before family therapy involving her daughter would be constructive or even safe." There is substantial evidence for this finding.

At trial, DCYF explained their decision to not proceed with family therapy, citing safety concerns arising during past visitations between J.M. and S.A.M-S. For example, the court heard testimony that towards the end of one visit, J.M. became extremely agitated when S.A.M-S. indicated she wished to leave. J.M.'s behavior escalated to the point that DCYF staff no longer felt safe and contacted the police. The court also received evidence that J.M. sent emails to DCYF staff that included threats of self-harm and death threats. DCYF staff further testified at trial, J.M. has "great difficulty holding space for her daughter's opinions and needs and feelings of safety" and, "for therapy to be successful, a child has to be safe being there."

The court also heard ample testimony that J.M.'s behavior at visitations and elsewhere had a direct negative effect on S.A.M-S. For example, the court heard testimony that allowing S.A.M-S. to refuse visits with J.M. resulted in "a marked decrease in [S.A.M-S.]'s anxiety" as she "was having several days of buildup of anxiety before knowing a visit was coming." As further example, S.A.M-S.'s behavior was also "very evident after visits" with J.M. as her "meltdowns and emotions were just out of control usually a day or two after visits." In sum, the court heard testimony detailing repeated and specific examples of the issues

arising from visitations between J.M. and S.A.M-S. and how that informed DCYF's decision to forgo family therapy.

The court also heard testimony from an Aleut Community representative. The representative testified that the tribe "had the opportunity to meet regularly with . . . third-party providers, mental health providers" and thus was "aware of services and education" offered. From this, the tribe believed "active efforts have been offered to this family through and through." This included their opinion that DCYF "attempted to support [J.M.] in having those visits [with S.A.M-S.] at their least restrictive and most meaningful" and "support[ed] a change in visitation to become more strict for the safety and wellbeing of [S.A.M-S.]; additionally, for other people that . . . were around [J.M.]." The representative also testified they were aware that J.M. had requested family therapy. In sum, the tribe supported DCYF's response while aware of J.M.'s requests and visitation issues. As such, the tribe's position counsels in favor of upholding the court's active efforts finding. G.J.A., 197 Wn.2d at 887 ("active efforts" must include "deference to the tribe at each step of the dependency.").

Together, this testimony contradicts J.M.'s claim that DCYF's decision on family therapy was unilateral or bereft of any effort to provide this service.

At oral argument, J.M.'s counsel argued for the first time that the real failure was that "there's no documentation that [DCYF] reached out to a single [family therapy] provider to see whether it could be successful in any way shape or form." Wash. Ct. of Appeals oral argument, supra at 6 min., 54 sec. through 7 min., 23 sec. (citing G.J.A., 197 Wn.2d at 889-90). Indeed, our Supreme Court has held

that DCYF "must document its provisions of active efforts in the record . . . *to enable the court to reach an informed conclusion* about [DCYF's] provision of active efforts." G.J.A., 197 Wn.2d at 893-94 (emphasis added). This argument fails because DCYF in fact explained their reasoning at length for not pursuing family therapy, providing a sufficient record for review. Id.

J.M. also cites to In re Dependency of A.T. for the proposition that DCYF "cannot give up merely because they were initially unsuccessful, but must 'brainstorm new strategies' to meet a parent's needs." (Quoting In re Dependency of A.T., 29 Wn. App. 2d 687, 707, 541 P.3d 1079 (2024)).

This argument ignores that A.T. also held that "[a]ctive efforts must be . . . 'tailored to the facts and circumstances of the case.'" 29 Wn. App. 2d at 704 (quoting 25 C.F.R. § 23.2). We do not understand ICWA and WICWA to require courts to demand a certain type of service, despite the clear unfortunate realities of a given case, such as here, where there is unrebutted testimony that J.M.'s behavioral health challenges negatively impacted S.A.M-S.'s own well-being and the safety of DCYF staff.

In short, the underlying findings are supported by substantial evidence, and, on our de novo review, those findings satisfy ICWA and WICWA. DCYF has demonstrated to us that it "made sufficient efforts" to repair the child-parent relationship, "and that those efforts 'proved unsuccessful.'" G.J.A., 197 Wn.2d at 875 (quoting 25 U.S.C. § 1912(d); RCW 13.38.130(1)).

3. Doctoral Level Clinician

Third, J.M. argues DCYF failed to engage in active efforts related to her

14

preferred mental health provider.

By way of additional background, pursuant to and shortly after the court's entry of the stipulated dispositional order, Dr. Marnee Milner conducted J.M.'s neuro-psychological evaluation.[9]  Afterwards, Dr. Milner recommended additional treatment:

> (a) Trauma-Focused Cognitive Behavioral Treatment [CBT] with a therapist trained to employ such an empirically based program to address her underlying trauma and subsequent symptoms and effects of her interpersonal functions; (b) Long Term Psychotherapy *with a doctoral level clinician* skilled in working with personality disorders to incorporate . . . CBT techniques to address the personality traits and subsequent behavioral, emotional, and social dysfunction.

(Emphasis added.)

J.M. shortly thereafter initiated services with Shawna Gallagher, who is affiliated with the Seattle Indian Health Board.  While DCYF supported J.M.'s continued visits with Gallagher, it quickly and repeatedly informed her that Gallagher was not a "doctoral level clinician" and, thus, she was not receiving the services recommended by Dr. Milner and as required by the court's order.

After trial, the court found that J.M. "failed to comply" with the requirement that she receive treatment from a "doctoral level clinician" as "she was unwilling to see an alternate provider to the mental health therapist who[m] she chose on her own, Shawna Gallagher."  The court further found J.M. "agreed that [DCYF] had explained to her that Ms. Gallagher did not meet the qualifications . . . because

---

[9] At trial, Dr. Milner testified that "a neuropsychological evaluation looks at brain and behavior, so brain functioning, looking at different domains of functioning . . . that correspond to different areas of the brain and to see strengths and weaknesses in a person's performance."

she practices as a licensed independent clinical social worker and not as a doctoral level clinician."

J.M. does not challenge the above findings and, instead, argues DCYF failed to sufficiently *investigate* Gallagher's qualifications to confirm she was a "doctoral level clinician." J.M. appears to refer to testimony by DCYF staff that they had a "repetitive conversation" with J.M. that they were not "able to verify that [Gallagher] had a Ph.D." and that they "could not reach her by phone, but we could see department of health records online, and could see that she was practicing as a licensed clinical social worker." J.M., in turn, avers that active efforts are not met when they call the provider "an unspecified number of times" and check a website, rather than do a thorough search of her qualifications and "brainstorm" new strategies. We disagree for four reasons.

First, J.M. ignores that Gallagher provided a "Therapist Disclosure Statement," which J.M. herself signed in March 2022. While this statement lists Gallagher's Doctorate of Psychology, it also states in the first sentence of its first paragraph that "Gallagher is currently practicing as a *Master Level* – Licensed Independent Clinical *Social Worker.*" (Emphasis added.) In other words, Gallagher's own documents concede the point that she is not licensed or practicing as a doctoral level clinician. There is substantial evidence that no further investigation was needed.

Second, and more substantively, J.M.'s argument is also undermined by other testimony. Dr. Milner reviewed Gallagher's visit notes and testified her treatment did not fully satisfy the recommendations. Specifically, Dr. Milner's

16

testified that, while Gallagher and J.M. were "trying to . . . work on some of the trauma," Gallagher's treatment would not "go towards the [second] part of [her] recommendation," namely, long term psychotherapy incorporating CBT techniques. Regardless of Gallagher's title or credentials, or how they were determined, there was substantial evidence that Gallagher was not trained to perform an essential part of the therapy Dr. Milner recommended.

Third, at trial, J.M. acknowledged DCYF put her on notice of the potential issues with Gallagher. Report of Proceedings (RP) at 149 ("They wanted me to see someone else, and I wanted to see this lady because she's culturally competent."). These "repetitive conversations" are unchallenged and part of DCYF's efforts to discuss and, thus, resolve any issues with Gallagher's treatment, including her qualifications.[10]

Fourth, at trial, DCYF asked an Aleut Community representative whether "the tribe consider[s] providing [J.M.] with different providers for counseling an active effort?" The representative answered, "[y]es, the tribe does consider that an active effort." Further, the representative answered affirmatively when asked if there were both "efforts made to connect [J.M.] with resources in services" and "ongoing efforts throughout the life of this case to check in with [J.M.] on her mental health state and what she might need in order to better process the case and work through it?" Again, WICWA and ICWA require that we defer to the tribe's position. G.J.A., 197 Wn.2d at 887 (requiring "deference to the tribe at each step of the

---

[10] The superior court also held service review hearings seven times between April 2021 and August 2023.

17

dependency, including . . . services.").

The court also heard testimony from a qualified expert witness with 15 years of experience with Native termination proceedings that DCYF "located a high level of services, and actually offered, and offered assistance with that, which also provides system and navigational support to be able to access those services."

G.J.A. is instructive by way of contrast. There, "[n]othing in the record suggest[ed] [the] professionals had experience working with Native families or that [DCYF] made any efforts to procure such services." G.J.A., 197 Wn.2d at 894. Further, DCYF's failure there was to such a degree that "one would think that the children were not Native and that ICWA and WICWA did not apply." Id. at 900. Here, DCYF did more than merely "provide referrals." Id. at 894. Again, DCYF clearly understood the limits of Gallagher's qualifications, actively engaged with J.M.'s concerns, and collaborated with tribal authorities to diligently search for qualified and culturally competent providers in a timely manner. In re Welfare of A.L.C., 8 Wn. App. 2d 864, 875, 439 P.3d 694 (2019) ("WICWA requires timely and diligent efforts to provide or procure services.").

In short, we hold the above evidence was "sufficient to persuade a fair-minded rational person" that DCYF engaged in active efforts to investigate, where needed, Gallagher's qualifications and otherwise substantively help J.M. meet Dr. Milner's recommendations. A.B., 181 Wn. App. at 59.

4. Parenting Component

Finally, the court's order required J.M. complete a "neuro-psychological evaluation with a parenting component." The court's order did not further define

"parenting component." J.M. argues Dr. Milner failed to conduct a parenting component as part of her neuro-psychological evaluation. She argues, in turn, that this failure amounts to failure to monitor her progress, contrary to WICWA's active efforts requirement.

We hold that there is substantial evidence, as the court found, that J.M., in fact, completed a "neuropsychological evaluation with parenting component with Dr. Milner in 2021."

At trial, Dr. Milner explained that she conducted an "Adult-Adolescent Parenting Inventory," which assessed J.M. for various factors like her beliefs on "corporal punishment" as well as her "levels of empathy" and "valuing independence or problem solving in children." In short, Dr. Milner testified that she conducted an evaluation with a parenting component. We do not "make credibility determinations or weigh evidence." A.B., 181 Wn. App. at 60.

In response, J.M. cites to G.J.A. for the proposition that DCYF must "consider alternative ways to address [her] needs if the optimum services are not available." (Citing G.J.A., 197 Wn.2d at 889-90.) She then argues that the "usual process" of observing a parent-child interaction did not happen, which makes the process incomplete.

In G.J.A., our Supreme Court held that "[n]othing in the record indicate[d] if or when the parenting assessment ever occurred or whether it was performed by a qualified professional." 197 Wn.2d at 881. Here, Dr. Milner testified she conducted the inventory (and thus a parenting assessment), but not through a direct parent-child observation because of the COVID-19 pandemic. DCYF

19

confirmed "children weren't able to come to the office" because of the pandemic. While an observation may have been the usual or even the optimum process, there is still substantial evidence that Dr. Milner conducted an alternative type of parenting assessment. Again, we do not "make credibility determinations or weigh evidence." A.B., 181 Wn. App. at 60. And the court's ordered treatment did not specifically require actual parent-child observation, nor does J.M. cite to any authority holding that such an evaluation requires such an observation.

In short, we hold the above evidence was "sufficient to persuade a fair-minded rational person" that DCYF conducted the required evaluation with parenting component, or an alternative, thus, satisfying the active efforts requirement. Id. at 59.

In summary, each of J.M.'s four overarching arguments failed to establish either that the court's findings were unsupported by substantial evidence or that DCYF otherwise did not satisfy WICWA or ICWA's active efforts requirement. A.L.K., 196 Wn.2d at 697.

C.      Non-WICWA or ICWA Based Assignments of Error

  1. Standard of Review for any Termination

Again, in general, all termination proceedings require the State to establish two sets of facts. K.M.M., 186 Wn.2d at 478. First, DCYF must establish the six elements of RCW 13.34.180(1). Id.; In re Dependency of K.D.S., 176 Wn.2d 644, 652, 294 P.3d 695 (2013). Second, DCYF must show that termination is in the best interest of the child. K.M.M., 186 Wn.2d at 478.

We assess whether DCYF has proven all six elements of RCW

13.34.180(1) by "clear, cogent, and convincing evidence." In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). This heightened standard requires evidence showing the superior court's findings are "'highly probable.'" In re Dependency of A.M.F., 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022) (internal quotation marks omitted) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). In other words, this evidentiary standard requires "more than a preponderance of the evidence, but less than what is needed to establish proof beyond a reasonable doubt." In re Estate of Barnes, 185 Wn.2d 1, 10 n.5, 367 P.3d 580 (2016).

Further, "terminations are fact specific and must be decided on a case by case basis." In re Welfare of N.M., 184 Wn. App. 665, 672, 346 P.3d 762 (2014). This is because "parent-child relationship necessarily involves both the parent and the child; thus, it is necessary to consider whether a parent is capable of parenting the particular child given the child's specific, individual needs." K.M.M., 186 Wn.2d at 490 (emphasis omitted).

2. Discussion

J.M. contests only the first step and specifically only elements (e) and (f) of RCW 13.34.180(1).[11] We address each in turn.

---

[11] The four unchallenged elements of RCW 13.34.180(1) are:
(a) The child is dependent.
(b) The court has entered a dispositional order.
(c) The child has or will (at the time of hearing) have been removed from the parent's custody for at least six months.
(d) The "services ordered . . . have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been

a. RCW 13.34.180(1)(e)

RCW 13.34.180(1)(e) requires DCYF establish there "is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." Further, a "parent's failure to substantially improve parental deficiencies within 12 months" after a dispositional order shall give rise to a rebuttable presumption this factor is satisfied as long as 13.34.180(1)(d) is satisfied. Id.

Here, the court found that "[g]iven the more than 38 months of services offered or provided during this dependency there is little likelihood that the conditions will be remedied so that the child could be returned to the mother in the near future. The near future for this child has passed."

J.M. argues that this finding is flawed in two ways. J.M. first argues the finding was not supported by substantial evidence. J.M. refers to testimony offered by Graff, the supervising DCYF social worker, in which she stated "'I would almost say that the foreseeable future has passed.'" J.M argues that this testimony, which merely stated the foreseeable future had "almost" passed, is insufficient to support the court's finding that DCYF satisfied RCW 13.34.180(1)(e). We disagree as ample evidence supports the court's finding beyond this possible misstatement.

Again, appellate review of findings of fact is limited to determining if they are supported by substantial evidence in the record. State v. Pratt, 11 Wn. App. 2d 450, 457, 454 P.3d 875 (2019). "Substantial evidence is evidence sufficient to

_____

expressly and understandably offered or provided."
RCW 13.34.180(1)(a)-(d).

22

persuade a fair-minded, rational person of the finding's truth." Id. More specifically to the issue at hand, "[w]hat constitutes 'near future'" is context specific and "depends on the age of the child and the circumstances of the child's placement." In re Welfare of C.B., 134 Wn. App. 942, 954, 143 P.3d 846 (2006).

It is undisputed that S.A.M-S. has lived out-of-home and outside of J.M.'s custody since the April 2020 domestic violence incident. S.A.M-S., who was five years old at the time of trial, had been in out-of-home care for three years. In other words, S.A.M-S. had been in out-of-home care for the majority of her life.

Further, S.A.M-S.'s guardian ad litem (GAL) testified that S.A.M-S. was "desperate for permanency" and that it was "in [S.A.M-S.'s] best interest to be adopted at the *earliest time available*." (Emphasis added). The GAL also testified that S.A.M-S. indicated "she wants the court to know that she wants no more visits, and that she wants to be adopted, and she wants to live in her current home forever."

Moreover, S.A.M-S.'s therapist testified that "[c]hildren do very well with predictability and being able to know what's going to happen next, especially when they have experienced trauma in their life" and, specifically "for [S.A.M-S.], it is helpful for her to know what's coming up, to help with any possible feelings of anxiety or worry." The therapist testified that S.A.M-S. had greater difficulties regulating or verbalizing emotions than a typical child of her age. For example, S.A.M-S. engaged in explosive, sometimes violent, outbursts or tantrums at daycare. RP at 86 (S.A.M-S. would "destroy the classroom, which would be like throwing chairs down and that sort of thing"). However, in S.A.M-S.'s current foster

home arrangement, "she has really done a great job of being able to identify what she is needing in the moment to help her calm down, and that, you know, and be able to label the feeling that she's having, which is huge progress from where we've started."

Additionally, the court heard testimony that S.A.M-S.'s current "foster parents have done incredible work about learning about the Aleut Community." S.A.M-S.'s current caretakers are connected to the Tlingit Haida tribe which is a sister tribe of the Aleut Community. As such, S.A.M-S. is still "connected to her culture," including "making cultural food . . . drumming and singing with them" with "plans to do bead work in the future." Both the Aleut Community representative and a qualified expert witnesses also supported S.A.M-S. current placement. In short, as in C.B., there is substantial evidence that "the children lived with [their caretaker] and were bonded in that placement." 134 Wn. App. at 954.

As to the timing of remediating J.M.'s parental deficiencies, Dr. Milner testified it would take "four to ten years" to treat J.M.'s behavioral health concerns. Dr. Milner explained that "long-term" treatment was required, not only because of J.M.'s numerous mental health challenges, but because J.M. has "a history of this rigid belief system," in which she had "no acknowledgment about any of her behaviors" and instead "externalized" issues "to others, not her own behavior."

Thus, there is substantial evidence for both S.A.M-S.'s imminent need and desire for permanency with the culturally competent family she is currently bonded and progressing with, and of the protracted period of time it will take for J.M. to cure her parental deficiencies. We hold that this evidence is sufficient to "persuade

a fair-minded, rational person" of the truth of the finding that the time for J.M. to cure her deficiencies was quite short. Pratt, 11 Wn. App. 2d at 457. Further, we hold the court's finding on RCW 13.34.180(1)(e) was supported by clear, cogent, and convincing evidence as the above evidence shows it was "'highly probable'" there was little likelihood conditions would be remedied in the near future. A.M.F., 23 Wn. App. 2d at 141 (internal quotation marks omitted) (quoting Sego, 82 Wn.2d at 739).

While there may be a minor, semantic discrepancy between Graff's testimony and the court's finding, that difference disregards the substantial evidence, and the court's substantive finding on RCW 13.34.180(1)(e), that the near future for permanency was short indeed, particularly when viewed from perspective of "age of the child and the circumstances of the child's placement." C.B., 134 Wn. App. at 954.

J.M.'s second argument is that the court finding the "near future has passed" was "inconsistent" with the legislative intent behind RCW 13.34.180(1)(e). Specifically, she avers that the statute's usage of "will" and "likelihood" indicates it is forward looking while the court's finding (i.e. "has passed") is backwards looking. While the court's holding may have been inartful, and in other circumstances quite concerning, we ultimately disagree.

First, J.M. offers five sentences of argument in support of her claim that it "is simply inconsistent with the legislature's purpose," to view the near future as the past, with no citation to authorities other than RCW 13.34.180(1)(e) itself. DeHeer, 60 Wn.2d at 126.

Second, J.M.'s focus on the court's usage of the phrase "has passed" is overly literal. Viewing the entirety of the evidence before the court (reviewed above), and court's termination order as a whole, the court was clearly concerned with the time it would still take for J.M. to complete her treatment—which is of course in the future—and the effect on S.A.M-S.'s desire for permanency—which is by definition forward looking. Again, had the court focused only on what had occurred, and not on what would occur, then error may have been present. But those are not the facts before us. On the record before us, it is "'highly probable'" that J.M.'s deficiencies were not going to resolve in the near future. A.M.F., 23 Wn. App. 2d at 141 (quoting Sego, 82 Wn.2d at 739).

  b. RCW 13.34.180(1)(f)

RCW 13.34.180(1)(f) states "the court must *consider* the efforts taken by [DCYF] to support a guardianship and whether a guardianship is available as a permanent option for the child." (Emphasis added.) J.M. argues the court failed both to consider "what efforts [DCYF] made to support a guardianship" and to conduct the analysis "on the record." We disagree.

Taking the latter argument first, we hold the court was not required to conduct an on-record analysis. RCW 13.34.180(1)(f) states the court need only "consider" DCYF's efforts on guardianship and its viability. RCW 13.34.180(1)(f) says nothing about required findings or any on-record analysis. J.M. also fails to cite any authorities that require an on-record analysis for guardianships under RCW 13.34.180(1)(f). DeHeer, 60 Wn.2d at 126.

Regardless, the court here both considered and explained its reasons for

rejecting the viability of guardianship on the record. The court's written order found that DCYF "has shown that guardianship here is not a viable alternative to termination." The court further explained that S.A.M-S.'s current caregivers were not interested in guardianship because it would "not be appropriately protective for them or for this child." At the end of trial, the court expressly stated that it "considered the viability of guardianship in this case" and that it was unavailable in light of S.A.M-S.'s need for "stability" and J.M.'s past "threatening" behaviors towards previous caretakers who withdrew their plans to adopt S.A.M-S.

The court appears to reference the trial testimony of S.A.M-S.'s former caregiver which discussed threats made by J.M. The former caregiver explained that J.M. accused her and her husband of child abuse multiple times. Further, J.M. livestreamed threats on Facebook that referenced the caregiver and her husband "by name saying what city we may live in, and that we're – so my husband's a molester, and I'm a child beater, and had threatened to send bikers after us." Ultimately, the caregiver requested DCYF change S.A.M-S.'s placement and cited J.M.'s threats.

After the former caregiver's testimony, the State asked J.M. if she "ma[d]e threats against [the former caregiver] and her family?" J.M. twice repeated she had the right to "stand [her] ground." Further, J.M. later admitted she made numerous Facebook posts about the former caregiver during trial.

In re Dependency of G.C.B. is instructive. 28 Wn. App. 2d 157, 535 P.3d 451 (2023). There, "the current caregiver to both children testified that her family 'discussed the potential for guardianship or adoption with [DCYF]'" and "said that

her family preferred adoption and that their home had already 'been approved for adoption.'" Id. at 175. There was further testimony that "'the children were thriving in their current placement, and a guardianship would keep them 'in limbo' with negative 'consequences.'" Id. at 174 Thus, this court upheld the court's finding that guardianship was inviable. Id. at 175.

Similarly, here, the court heard testimony that DCYF discussed guardianship with S.A.M-S.'s current foster home on an "ongoing basis." As part of these discussions, S.A.M-S.'s current foster home expressed concerns that guardianship would harm S.A.M-S.'s need for permanency, finality, and security.

We hold that this evidence is sufficient for a reasonable person to conclude that it was "'highly probable'" that a guardianship was considered and found to inappropriate. In re Dependency of A.N.C., 24 Wn. App. 2d 408, 414-15, 520 P.3d 500 (2022) (internal quotation marks omitted) (quoting In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)). And, the court's findings on the viability of guardianship were supported by clear, cogent, and convincing evidence. Id.

### III.     CONCLUSION

We affirm the court's order terminating J.M.'s parental rights to S.A.M-S.

Díaz, J.

WE CONCUR:

Birk, J.

Smith, C.J.

28